1  Jeremy Sugerman, Esq., SBN 146315
2  **GORDON-CREED, KELLEY,**
   **HOLL & SUGERMAN, LLP**
3  222 Kearny Street, Suite 650
   San Francisco, California 94108
4  Telephone: (415) 421-3100
   Facsimile: (415) 421-3150
5
6  Attorneys for Plaintiffs







7            IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
10  **USA SUNSET MEDIA 3, LLC,** a Delaware
    limited liability company;
11  **USA SUNSET MEDIA 4, LLC,** a Delaware
    limited liability company;
12  **USA SUNSET MEDIA 5, LLC,** a Delaware
    limited liability company;
13  **USA SUNSET MEDIA 6, LLC,** a Delaware
    limited liability company;
14  **USA SUNSET MEDIA 7, LLC,** a Delaware
    limited liability company;
15  **USA SUNSET MEDIA 8, LLC,** a Delaware
16  limited liability company;
    **USA SUNSET MEDIA 9, LLC,** a Delaware
17  limited liability company;
    **USA SUNSET MEDIA 10, LLC,** a Delaware
18  limited liability company;
    **USA SUNSET MEDIA 11, LLC,** a Delaware
19  limited liability company;
20  **USA SUNSET MEDIA 12, LLC,** a Delaware
    limited liability company;
21  **USA SUNSET MEDIA 13, LLC,** a Delaware
    limited liability company;
22  **USA SUNSET MEDIA 15, LLC,** a Delaware
23  limited liability company;
    **USA SUNSET MEDIA 17, LLC,** a Delaware
24  limited liability company;
    **USA SUNSET MEDIA 18, LLC,** a Delaware
25  limited liability company;
26  **USA SUNSET MEDIA 19, LLC,** a Delaware
    limited liability company;
27  **USA SUNSET MEDIA 20, LLC,** a Delaware
28  limited liability company;

**C V 11 0654**

**COMPLAINT (Damages for
Federal Securities Act Violations;
California Securities Act
Violations; Federal RICO
Violations; Fraud; Breach of
Contract; Breach of Fiduciary
Duty; Negligence; Negligent
Misrepresentation; Civil
Conspiracy; Constructive Trust;
Rescission; Disgorgement; and
Unjust Enrichment)**

**DEMAND FOR JURY TRIAL**

1 | **USA SUNSET MEDIA 21, LLC,** a Delaware limited liability company;
2 | **USA SUNSET MEDIA 22, LLC,** a Delaware limited liability company;
3 | **USA SUNSET MEDIA 23, LLC,** a Delaware limited liability company;
4 | **USA SUNSET MEDIA 24, LLC,** a Delaware limited liability company;
5 |
6 | **USA SUNSET MEDIA 25, LLC,** a Delaware limited liability company;
7 | **USA SUNSET MEDIA 26, LLC,** a Delaware limited liability company;
8 | **USA SUNSET MEDIA 27, LLC,** a Delaware limited liability company;
9 | **USA SUNSET MEDIA 28, LLC,** a Delaware limited liability company;
10 |
11 | **USA SUNSET MEDIA 29, LLC,** a Delaware limited liability company;
12 | **USA SUNSET MEDIA 30, LLC,** a Delaware limited liability company;
13 | **USA SUNSET MEDIA 31, LLC,** a Delaware limited liability company;
14 | **USA SUNSET MEDIA 32, LLC,** a Delaware limited liability company; and
15 | **USA SUNSET MEDIA 33, LLC,** a Delaware limited liability company,
16 |

17 | Plaintiffs,

18 |

19 | vs.

20 | **U.S. ADVISOR, LLC,** a Virginia limited liability company; **CB RICHARD ELLIS INVESTORS, L.L.C.,** a Delaware limited liability company; **CB RICHARD ELLIS INVESTORS/U.S. ADVISOR, LLC,** a Delaware limited liability company; **STRATEGIC CAPITAL HOLDINGS, LLC (formerly known as U.S. Commercial LLC),** a Virginia limited liability company; **USA SUNSET MEDIA, LLC,** a Delaware limited liability company; **USA SUNSET MEDIA MANAGEMENT, LLC,** a Delaware limited liability company; **U.S. SELECT SECURITIES LLC,** a Virginia limited liability company; **KEVIN**

1  **FITZGERALD**, an individual; **H.**
   **MICHAEL SCHWARTZ,** an individual;
2  **GLEN MCCRAE,** an individual, **PAULA**
   **MATHEWS**, an individual; **GAVIN HINZE**,
3  an individual; and **JOHN DOES 1 through**
4  **50;**

5          Defendants.

6

7      Plaintiffs allege:

8                    **NATURE OF THE ACTION**

9                             **1.**

10     This action seeks to recover damages, rescission, treble damages, punitive damages, and

11  disgorgement of ill-gotten gains, as the result of the fraudulent scheme described below.

12                             **2.**

13     Defendants, through an entity they owned and controlled, purchased the Sunset Media Tower, a

14  building in Los Angeles California (the "Tower"), for $82.5 million. Through a scheme incorporating

15  material misrepresentations and omissions, defendants immediately syndicated interests in the Tower for

16  $98 million. As a result of the scheme, plaintiffs purchased tenancy in common ("TIC") interests in the

17  Tower. Plaintiffs are single-owner LLCs that are owned by persons who were induced to purchase what

18  they were told were investments in real estate to obtain tax benefits, managed by defendants. The large

19  majority of the plaintiff LLC owners are California residents. Defendants are California residents who

20  created and perpetrated their fraudulent scheme in California.

21                             **3.**

22     Defendants convinced plaintiffs, to invest in the Tower through an array of omissions and

23  misrepresentations, including providing misleading financial information and projections, conveying

24  misinformation about the property, and concealing their "track record" with similar buildings. At the

25  heart of the scheme, defendants created the illusion that plaintiffs would receive guaranteed distributions

26  of a 6% return on investment out of positive cash flow on the building. In reality, the Tower could not

27  have paid and was not able to pay the returns that defendants had projected. Instead of revealing these

28  issues to plaintiffs, defendants concealed the truth prior to closing and then paid "distributions" to

1   plaintiffs that made it appear the building was doing well. These distributions were not funded out of
2   positive cash flow, but were instead payments out of the reserves that the plaintiffs themselves had
3   contributed when purchasing the Tower.

**4.**

5   Defendants made lavish presentations to potential investors – most of them retirees – to convince
6   them to invest in the Tower. The presentation included a stay in a swank hotel, with chilled Champagne
7   waiting in their rooms and magnificent meals. During these presentations, representatives of defendants,
8   including specifically H. Michael Schwartz and Paula Mathews, made false promises and omitted
9   material information, including the following:

10  •   This was a safe investment that was "guaranteed" to produce distributions of "at least" an
11  annual 6% return on investment. Others were told that 6% was a "downside cushion" and that the actual
12  expected returns were expected to be 10%. Defendants represented that they used the 6% figure because
13  they wanted to "under promise and over perform."

14  •   They needed to "act immediately" to invest in the Tower, the syndication was undersold.

15  •   The asbestos in the Tower was 85% abated, and the sponsor was leaving $5 million of its
16  money "on the table" to make sure the rest of the building was abated. (Neither statement was true, and
17  as of today, the asbestos has not been entirely abated).

18  •   Although defendants "might" retain or sell ownership in the project to investors other
19  than the TIC investors, that interest would not have any voting rights. (In fact, the retained interest was
20  syndicated at the same time as the TIC interests, and has important veto and voting power). Other
21  investors were told that the sponsors would not take any interest at all in the Tower, and were not
22  provided the documents that suggested otherwise.

24  •   Some plaintiffs were told that the intent of purchasing the property was to quickly resell
25  it at a profit. At least one was told by laughing and celebrating defendants, they would "double your
26  money" by flipping the property.

27  •   Other plaintiffs were told that the investment was intended to be a long term, safe income
28  stream for them.

1    Representatives of defendants, including H. Michael Schwartz and Paula Mathews, instructed
2    some plaintiffs to misrepresent their assets and income on their applications. Investors were told to "just
3    write in," qualifying information because "no one will check it anyway."

4    As a result, a significant proportion of plaintiffs invested the bulk of their net worth into the Tower,
5    relying on it to produce income for the rest of their lives. When this investment failed, some plaintiffs
6    have been forced to live on their social security income alone.

**5.**

8    Defendants, it turns out, had previously perpetuated similar schemes when syndicating other
9    buildings to other investors. Yet, defendants represented to plaintiffs that their management of prior
10   syndications had been successful, while all the while concealing their use of the reserves to make their
11   negative track record appear attractive to plaintiffs, who were about to invest in the Tower in reliance on
12   the defendants' claimed management expertise.

**6.**

14   Defendants include (1) the instigators of the transaction, who were responsible for creating the
15   scheme and generating over $4 million in payments to themselves and their affiliates; (2) the broker
16   manager and broker dealers who made misrepresentations to the plaintiffs (or created or caused them to
17   be made) and who were unjustly enriched by receiving "commissions" or other payments totaling at
18   least $3,440,000; (3) the Tower manager, USA Sunset Media Management, LLC and other entities or
19   individuals, who, among other things, prepared misleading financial statements that first prevented
20   plaintiffs from making an informed purchase decision and then, later, prevented plaintiffs from
21   discovering the initial misrepresentations and omissions; and (4) other entities or individuals who acted
22   in concert with defendants in furtherance of their scheme.

**7.**

24   Plaintiffs are entitled to recover their damages, and force defendants to disgorge their wrongful
25   gains, based on (1) violations of state and federal securities laws; (2) common law fraud; (3) negligence
26   and gross negligence; (4) breach of contract, including breach of the covenant of good faith and fair
27   dealing; (5) breach of fiduciary duty, (6) disgorgement, and (7) alternatively, violations of federal RICO

28

1  statutes. Because defendants' wrongful acts constitute violations of California's securities statutes,

2  plaintiffs are also entitled to rescission.

3  ## JURISDICTION AND VENUE

4  ### 8.

5  The Court has federal question subject matter jurisdiction and supplemental jurisdiction over this

6  action pursuant to 28 U.S.C. § 1331, 18 U.S.C. §1965(a), and 28 U.S.C. §1367(a).

7  ### 9.

8  The Court has personal jurisdiction over the defendants by virtue of their residency in the State

9  of California, transacting business in the State of California and committing tortious acts in the State of

10  California.

11  ### 10.

12  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

13  ## PARTIES

14  ### 11.

15  Plaintiffs are each Single Purpose Delaware Limited Liability Companies formed for investors as

16  vehicles to purchase tenancy in common (or "TIC") interests in the Tower.  The following table lists

17  each plaintiff LLC and its owner(s)' state of residence:

| PLAINTIFF | STATE OF RESIDENCE |
|---|---|
| Sunset Media 3, LLC | California |
| Sunset Media 4, LLC | Oregon |
| Sunset Media 5, LLC | California |
| Sunset Media 6, LLC | Georgia |
| Sunset Media 7, LLC | California |
| Sunset Media 8, LLC | California |
| Sunset Media 9, LLC | California |
| Sunset Media 10, LLC | California |
| Sunset Media 11, LLC | California |

| PLAINTIFF | STATE OF RESIDENCE |
|-----------|---------------------|
| Sunset Media 12, LLC | California |
| Sunset Media 13, LLC | Arizona |
| Sunset Media 15, LLC | New Zealand |
| Sunset Media 17, LLC | California |
| Sunset Media 18, LLC | Pennsylvania |
| Sunset Media 19, LLC | California |
| Sunset Media 20, LLC | California |
| Sunset Media 21, LLC | California |
| Sunset Media 22, LLC | Georgia |
| Sunset Media 23, LLC | Oregon |
| Sunset Media 24, LLC | California |
| Sunset Media 25, LLC | California |
| Sunset Media 26, LLC | California |
| Sunset Media 27, LLC | California |
| Sunset Media 28, LLC | Connecticut |
| Sunset Media 29, LLC | Washington |
| Sunset Media 30, LLC | California |
| Sunset Media 31, LLC | California |
| Sunset Media 32, LLC | California |
| Sunset Media 33, LLC | California |

**12.**

Defendant U.S. Advisor, LLC is a Virginia limited liability company, with its principal place of business in California.

**13.**

Defendant CB Richard Ellis Investors, L.L.C. is a Delaware limited liability company, with its principal place of business in California.

**14.**

Defendant CB Richard Ellis Investors/U.S. Advisor, LLC is a Delaware limited liability company, with its principal place of business in California.

**15.**

Defendant Strategic Capital Holdings, LLC (formerly known as U.S. Commercial, LLC) is a Virginia limited liability company, and a subsidiary of U.S. Advisor, LLC, with its principal place of business in California.

**16.**

Defendant USA Sunset Media, LLC, is a Delaware limited liability company, with its principal place of business in California.

**17.**

Defendant USA Sunset Media Management, LLC is a Delaware limited liability company, with its principal place of business in California. The sole member of USA Sunset Media Management, LLC is CBREI/USA, owning 100% of the membership interests.

**18.**

U.S. Select Securities LLC is a Virginia limited liability company ("U.S. Select"), with its principal place of business in California, and is a wholly owned subsidiary of U.S. Advisor.  U.S. Select Securities was formed in October 2004 and became approved as a NASD member in February 2005. U.S. Select acts as the Dealer Manager for U.S. Advisor offerings.

**19.**

Defendant U.S. Commercial, LLC is a wholly-owned subsidiary of defendant U.S. Advisor, LLC, which manages the commercial real estate properties in U.S. Advisor, LLC's real estate portfolio.

**20.**

Defendant Kevin Fitzgerald is an individual residing in California.  During the pertinent time period, Fitzgerald was the Chairman and President of U.S. Commercial LLC (now Strategic Capital Holdings LLC).

**21.**

Defendant H. Michael Schwartz is an individual residing in California. During the pertinent time period, Schwartz served as Vice Chairman or Co-President of U.S. Advisor, LLC, the president of U.S. Commercial LLC (now Strategic Capital Holdings LLC) and was the registered principal of U.S. Select Securities LLC.

**22.**

Defendant Glenn McCrae is an individual residing in California. McCrae was the Chief Operating Officer of U.S. Commercial LLC (now Strategic Capital Holdings LLC) during the pertinent time period. McCrae was also the President of U.S. Select, and was responsible for oversight of all regulatory and financial matters for U.S. Select as the broker dealer for the Tower transactions.

**23.**

Defendant Paula Mathews is an individual residing in California. During the pertinent time period, Mathews served as a director and officer of U.S. Commercial LLC, (now Strategic Capital Holdings, LLC). Mathews was responsible for pre-acquisition due diligence and post-acquisition management and leasing of all commercial assets for U.S Advisor, LLC, including the Tower.

**24.**

Defendant Gavin Hinze is an individual residing in California. Hinze was a director for CBREI and worked with the property manager, USA Sunset Media Management LLC. Hinze communicated with the owners regarding the management of the Tower.

**25.**

John Does 1 – 50 are persons who prepared or aided in preparation of the projections, proposed budgets and subscription materials provided to plaintiffs. They also include successors and assigns of defendants and others who participated in the scheme to defraud plaintiffs, including employees and agents of the broker U.S. Securities LLC.

**26.**

The defendants shall hereinafter be referred to collectively as the "Sunset Media Entities" and their business operations as the "Sunset Media Enterprise."

1

## COMMON FACTUAL ALLEGATIONS

2

**I.    The Sunset Media Enterprise**

3

**27.**

4

At all material times, defendants were engaged in the business of purchasing or controlling real

5

estate projects, then syndicating those projects to individual investors – including retaining interests for

6

themselves, and managing the syndicated projects.

7

**28.**

8

Defendant U.S. Advisor, LLC was engaged in the business of locating real estate projects,

9

teaming with investors to purchase or control the projects, syndicating the projects, finding investors to

10

purchase interests in the syndicated properties, and managing the properties before, during and after

11

syndication.

12

**29.**

13

Defendant CB Richard Ellis Investors, L.L.C. is in the business of investing in real estate

14

projects.

15

**30.**

16

Defendant CB Richard Ellis Investors/U.S. Advisor, LLC was formed by CB Richard Ellis

17

Investors, LLC and U.S. Advisor, LLC for the purpose of purchasing or controlling real estate

18

investments, including the Tower.

19

**31.**

20

Defendant USA Sunset Media, LLC, was a wholly-owned subsidiary of CB Richard Ellis

21

Investors/U.S. Advisor, LLC formed to purchase the Tower and to then immediately resell fractional

22

interests in the Tower (the "TIC Interests") to tenant-in-common investors (the "Co-Owners").

23

**32.**

24

Defendant USA Sunset Media Management, LLC was a wholly-owned subsidiary of CB Richard

25

Ellis Investors/U.S. Advisor, LLC created to manage the Tower.

26

**33.**

27

U.S. Select Securities LLC is a wholly owned subsidiary of U.S. Advisor, which acted as the

28

Dealer Manager for U.S. Advisor offerings, including the Tower. As such, U.S. Select is responsible for

ensuring compliance with SEC and NASD regulations.  In general and specifically with respect to the
Sunset Media Enterprise, it also supervises selling relationships, assists in the assembly and due
diligence of private placement memoranda, and is responsible for ensuring proper handling of
investment proceeds.  U.S. Select Securities LLC acted as a securities broker for the Sunset Media
Enterprise for the purpose of selling the TIC interests to investors either directly or through
arrangements with third-party brokers and dealers.

**34.**

An individual invested in the Tower by forming a single-purpose limited liability company,
organized in Delaware.  The investors sought to engage in like-kind exchanges under section 1031 of the
Internal Revenue Code, and the Sunset Media Entities designed the TIC LLC structure to make
investment in the facilities attractive to those investors.  In most cases, the individual investor, however,
and not the LLC, was the customer of one or more of the defendants, or their broker/dealers, before
investing.

**35.**

These investment opportunities were securities but were not registered as securities with any
state or federal authority.

**36.**

A significant number of investors were at or near retirement age.  Typically, the Sunset Entities
recommended to the average investor that they do an IRC 1031 exchange of all or substantially all of the
investor's investment dollars, thereby unduly concentrating the investor in one sector and one type of
investment that was illiquid and highly risky.  These transactions were unsuitable for many of the
investors that the Sunset Entities recommended them to.

**37.**

In the fall of 2005, Defendants Mathews and Schwartz other representatives of defendants
during oral presentations represented to plaintiff that they were "guaranteed" to make 6% annual returns
by investing in the building, that the 6% return was a "conservative" figure, that the building would be
flipped within a few years at a large profit, that the Tower was a "safe" investment, that if the defendants
retained an interest in the property they would not retain voting rights (others were told that the

1   defendants would not retain any interest), and that asbestos in the Tower was 85% abated and the

2   sponsors would leave $5 million of their money "on the table" to make sure the asbestos was abated.

**38.**

4   Defendants Mathews and Schwartz and other representatives of defendants told plaintiffs that

5   they should "just write in" information that would make them "qualified investors" under federal law so

6   that they could invest in the Tower.

**39.**

8   The SMT transaction was only one of a series of transactions wherein U.S. Advisors and CB

9   Richard Ellis Investors, and their affiliates, either together or separately with other partners, purchased

10   or gained control over real estate projects in order to syndicate the projects to investors and make

11   millions of dollars in fees as part of the transfer to the investors.

12   **II.   The Transactions**

**40.**

14   The Sunset Media Tower is a 320,905 square-foot office and retail building located in

15   Hollywood California (the "Tower").

**41.**

17   USA Sunset Media, LLC purchased the Tower in October, 2005 for a purchase price of

18   $82,500,000, with the intent of immediately reselling its interest to tenant-in-common ("TIC") investors.

**42.**

20   The Sunset Media Enterprise offered TIC interests to investors to facilitate the purchase of the

21   Tower from USA Sunset Media, LLC.

**43.**

23   Defendants required an individual interested in investing in this project to form a single-purpose

24   limited liability company, organized in Delaware. Each investor's LLC would then hold the fractional

25   tenant-in-common interest in the Tower purchased from USA Sunset Media, LLC.

**44.**

27   The Sunset Media Enterprise raised $43,000,000 from investors for the purpose of purchasing

28   the Tower from USA Sunset Media, LLC.

**45.**

The sale of the TIC interests was originally supposed to close no later than December 31, 2005.

**46.**

On January 6, 2006, Schwartz informed the owners that U.S. Advisors was preparing a supplement to the private placement memorandum (the "PPM") to update investors on the progress of the building since August of 2005. The only change that was identified was increased occupancy from 90% to 94% which created an increase in cash flow from 5.5% to 6.0%.

**47.**

On February 14, 2006, USA Sunset Media 2, LLC though USA Sunset Media 26, LLC closed on their purchase of their TIC interests in the Tower.

**48.**

On March 14, 2006, plaintiffs USA Sunset Media 27, LLC though USA Sunset Media 33, LLC closed on their purchase of their TIC interests in the Tower.

**49.**

The co-owners purchased the Tower from USA Sunset Media, LLC for a total of $98,000,000. The co-owners invested $43,000,000. Each plaintiff co-owner purchased their TIC share of the Tower pursuant to a Purchase Agreement (Exhibit A), in the following amounts:

| PLAINTIFF | OWNERSHIP PERCENTAGE |
| --- | --- |
| Sunset Media 3, LLC | 1.875% |
| Sunset Media 4, LLC | 2.375% |
| Sunset Media 5, LLC | 2.875% |
| Sunset Media 6, LLC | 3.000% |
| Sunset Media 7, LLC | 10.250% |
| Sunset Media 8, LLC | 1.625% |
| Sunset Media 9, LLC | 4.700% |
| Sunset Media 10, LLC | 3.000% |
| Sunset Media 11, LLC | 3.000% |
| Sunset Media 12, LLC | 2.250% |

| PLAINTIFF | OWNERSHIP PERCENTAGE |
|---|---|
| Sunset Media 13, LLC | 3.000% |
| Sunset Media 15, LLC | 2.125% |
| Sunset Media 17, LLC | 3.000% |
| Sunset Media 18, LLC | 3.452% |
| Sunset Media 19, LLC | 1.875% |
| Sunset Media 20, LLC | 1.875% |
| Sunset Media 21, LLC | 1.500% |
| Sunset Media 22, LLC | 2.125% |
| Sunset Media 23, LLC | 2.375% |
| Sunset Media 24, LLC | 13.005% |
| Sunset Media 25, LLC | 2.875% |
| Sunset Media 26, LLC | 2.375% |
| Sunset Media 27, LLC | 1.750% |
| Sunset Media 28, LLC | 1.625% |
| Sunset Media 29, LLC | 3.000% |
| Sunset Media 30, LLC | 1.744% |
| Sunset Media 31, LLC | 1.104% |
| Sunset Media 32, LLC | 0.666% |
| Sunset Media 33, LLC | 0.666% |

**50.**

In addition to the $43 million investment by the TIC owners, the Sunset Enterprise also obtained a $55 million mortgage loan from PNC Bank to cover the $98,000,000 purchase price. The $55 million mortgage loan requires, among other things, a constant payment of $303,031.08 on the first day of February 2011 until December 2015 and a scheduled monthly payment of $22,916.67.

III.   **The Solicitation Materials Make Material Misstatements and Omissions**

**51.**

U.S. Select Securities LLC used a network of brokers and dealers to solicit potential investors. U.S. Select Securities LLC received commissions from the funds raised, and also paid the brokers and dealers a commission from the funds raised. U.S. Select Securities LLC and the broker dealers received more than $3.4 million as commissions for their solicitation of investors and sale of securities.

**52.**

The Sunset Media Entities used various marketing materials, including a private placement memorandum (the "PPM"), an addendum to the PPM, a supplement to the PPM, projections, and form agreements to market the investment opportunities to potential investors. Included were the following documents, all of which were subsequently assumed by Co-Owners: (a) mortgage loan documents with PNC BANK, (b) Co-Ownership Agreement (Exhibit B), and (c) a Management Agreement (Exhibit C) with USA Sunset Media Management, LLC (the "Manager"). The Sunset Media Entities also made presentations to potential investors. These materials and presentations are referred to herein as the "Solicitation Materials." In some cases, the packages of Solicitation Materials provided to the plaintiffs were incomplete. Some investors did not receive copies of the addendum or supplement to the PPM, and were not informed that their materials were incomplete.

**53.**

The Solicitation Materials purported to describe the Tower, its projected financial performance, and the investment opportunities and risks. However, the Solicitation Materials contained misstatements and made omissions of material fact that rendered them misleading.

IV.   **Misleading information about the investments and the returns**

**54.**

At the time that Schwartz and the Sunset Entities made the representation that the Tower was projected to create annual distributions of a 6% return on investment, defendants knew that their projections were unobtainable. The $82,500,000 building the Sunset Media Enterprise purchased was worth no more than $82,500,000. The plaintiffs' $98,000,000 purchase of that same building created a highly leveraged investment that could not support annual distributions of 6% return on investment.

1

**55.**

2    Although the Solicitation Materials disclosed the $15,500,000 markup, defendants did not

3 disclose material risks associated with it. Defendants only agreed to provide an appraisal if requested,

4 but would only supplement the PPM if the appraisal showed a value of less than $82,500,000.

5

**56.**

6    Rather than provide the investors with information that would have allowed them to understand

7 that annual distributions of 6% return on investment were unobtainable, defendants created a reserve

8 account (the "Reserve") to be used to create the illusion of returns.

9

**57.**

10    Defendants created a multi-million dollar reserve for the sole purpose of siphoning plaintiffs'

11 investments back to them in what appears to be a return *on* investment, but what was actually a return *of*

12 their investment.

13

**58.**

14    Defendants concealed the purpose of the Reserve both through misleading information in the

15 Solicitation Materials, and by making misrepresentations about the amount of capital improvements they

16 intended to make to the building. The Tower was one of only two post-WWII high rise buildings in the

17 area that had not been substantially renovated. Investment to renovate the building was an obvious

18 "next step," and the Sunset Media Entities represented to investors that these capital improvements

19 would be undertaken, and paid for from reserves.

20

**59.**

21    Defendants also failed to disclose costs that were expected, including the cost of earthquake

22 insurance, so that the projections of cash flow would appear positive.

23

**60.**

24    From the time of closing, the Sunset Media Entities continued to conceal from investors the fact

25 that the building was not paying them a 6% return. In monthly "operating reports," defendants

26 misrepresented payments to the investors as "TIC distributions." According to the Management

27 Agreement, these distributions were to be calculated as follows: "[A]ll rents and other funds collected

28 in the Operating Account after payment of all operating expenses, debt service and such amounts as may

be determined by the Manager to be retained for reserves or improvements, shall be paid to the Co-Owners in proportion to their respective undivided interests in the Property." (Management Agreement at 11.)

**61.**

Had the projections contained in the Solicitation Materials calculated cash flow based on the Management Agreement formula, then the projections of distributions to investors would have been dramatically reduced.

**62.**

Had the payments to the Co-Owners been made as disclosed in the Management Agreement and PPM, the Co-Owners would have been paid only a fraction of the "distributions" that they were actually paid.

**63.**

Instead, defendants paid plaintiffs from plaintiffs-owned reserves, so that it would appear to plaintiffs that they were receiving the projected 6% return.

**64.**

Defendants tapped the Reserve to make distributions to owners in 2006, 2007 and 2008.

**65.**

By March 2009, the Reserve had been depleted from $6.5 million to approximately $1.1 million.

**V.    The Sunset Entities Misrepresent their Track Record**

**66.**

In addition to misrepresentations about the projected cash flow of the building, defendants misrepresented the ability of the Sunset Media Enterprise to create value for the investors, by failing to disclose in the material problems that had occurred in similar deals of the Sunset Media Enterprise and of U.S. Advisors and its affiliates.

**67.**

The Solicitation Materials and defendants represented and implied that U.S. Advisors and its affiliates had a history of similar transactions that had been successful for their investors.

**68.**

Defendants represented that the principals of the Manager had substantial prior experience in the management of commercial properties, but failed to disclose the often negative results in that prior experience.

**69.**

The experience of the Sunset Media Entities was material to the plaintiffs in deciding to invest in the project. The Solicitation Materials themselves justified the purchase of the $82,500,000 building for $98,000,000 by representing: "The Investors are, however, acquiring their Interests based on the existence of the financing and the Management Agreement and the management expertise provided thereunder by the Manager." PPM at p. 47.

**70.**

Defendants failed to disclose any negative information about their past transactions, which would have been material to investors.

**71.**

On August 15, 2008, in an SEC-mandated prospectus for a public offering, an affiliate of U.S. Advisors revealed the actual performance of the Sunset Media Entities in similar projects.

**72.**

That prospectus revealed that as of the time of the PPM, the Sunset Media Entities had not achieved returns on any of their projects that were as high as the projections contained in the PPM.

**73.**

That prospectus also revealed that the Sunset Media Entities, as they did in this case, had repaid other investors in other projects out of those investors' Reserve accounts.

**VI.  Misrepresentations about defendants' continuing control of the property**

**74.**

Defendants revealed in their addendum to the PPM ("the Addendum") that they would be offering "units" in USA Sunset Media, LLC, which would be owned by persons other than plaintiffs and that the units were not subject to a 1031 exchange. The entity would then retain a share of ownership in the Tower. Most plaintiffs were not provided a copy of the Addendum prior to closing.

**75.**

Those who obtained "units" in USA Sunset Media, LLC were principals and insiders of defendants, or were investors with different goals than plaintiffs.

**76.**

Many of the plaintiffs were not provided with a copy of the Addendum.

**77.**

The Addendum also misrepresented defendants' intentions with regard to retaining an interest in the Tower. The Addendum states that "whether the Sponsor retains any Units in [Defendant USA Sunset Media, LLC] depends on the number of units sold pursuant to this Addendum." In fact, defendants had already begun soliciting investments in the "units" in Defendant USA Sunset Media, LLC at the time this statement was made.

**78.**

Because significant decisions relating to the Tower must be made by unanimous consent, the retained ownership of an interest in the tower through USA Sunset Media LLC units allows defendants to "veto" any actions it do not desire, such as changing the manager to someone who is not owned and controlled by defendants or changing the terms of the Management Agreement and Co-Ownership Agreement for the property. At least one plaintiff who questioned this arrangement was told that this retained interest would not have any voting rights (others were told that the defendants would not retain any interest).

**79.**

Prior to this litigation, another group of investors wanted to purchase the Tower. The Management Agreement provided defendants with exclusive rights to sell the building. For a sale to occur, defendants demanded substantial fees to which they were not entitled by contract. As a consequence of defendants' demands, the sale did not occur.

**VII.  Defendants misuse funds and hide information from investors**

**80.**

Defendants continued to drain plaintiffs' Reserve even as the economy was in a recession.

**81.**

1

2    Some owners asked defendants where the funds were coming from to pay their distributions.

3    Owners were told that Hinze and Mathews were "very busy," and could not respond to their requests.

4    One was even told that "we are prohibited from talking to investors during office hours."

5    **82.**

6    In several contexts, defendants continued to mislead the investors about the use of the Reserve

7    funds, stating, for example, that:

8        "With respect to cash there may have been a situation where at a snapshot in time
         there were funds moved to cover a temporary cash timing issue. At the end of the
9        day cash distributed to investors has been approximately equivalent to the cash
         generated from earnings on the Tower and cash reserves were used for that
10       purpose as well."

11   **83.**

12   In fact, the use of reserves was not a "temporary cash timing issue." Millions in dollars of the

13   Reserve have been used to make distributions to investors. As a result, promised capital improvements

14   have not been made, and reserves were drained at a time when they should have been retained to support

15   the Tower.

16   **84.**

17   The Manager also wasted money on projects that were unnecessary, and did not provide

18   plaintiffs with information about the expenditures.

19   **85.**

20   Defendants continuously concealed and withheld the material facts from plaintiffs so as to

21   prevent plaintiffs from attempting to recover their investments or file a claim against them.

22   **86.**

23   Defendants never informed plaintiffs of the true facts and plaintiffs did not discover the true facts

24   until 2010 and thereafter.

25   **VIII.   This action is not subject to mandatory arbitration**

26   **87.**

27   None of the plaintiffs reside in Illinois, nor do the individual owners of the plaintiff LLCs. None

28   of the defendants reside in Illinois. The Tower is not located in Illinois.

**88.**

As part of their scheme to defraud plaintiffs and make bringing a lawsuit against them as difficult as possible, defendants inserted an arbitration clause in the purchase agreement purporting to require arbitration in Chicago, Illinois for disputes arising out of that agreement. To make bringing a lawsuit against them even more difficult, they included choice-of-forum clauses in the Management Agreement and Co-Ownership Agreement that purport to require that a lawsuit be brought in court (not in arbitration) in Chicago, Illinois for disputes arising out of those agreements. The agreements also purport to waive plaintiffs' rights to litigate in any other venue or forum.

**89.**

In purporting to require that a lawsuit against them be brought in contradictory venues in a state with no relation to the Tower or any of the parties, and in purporting to waive plaintiffs right to litigate in the state where the large majority of them reside and where defendants' bad acts took place, defendants have attempted to divest plaintiffs of the protections of the California Securities Laws. As a consequence, the arbitration and choice-of-venue clauses violate California public policy, as established by the decisions of the California courts, and are unenforceable.

### FIRST CLAIM FOR RELIEF

### (Federal Securities Law Violations – All Defendants)

**90.**

The allegations and averments in each of the paragraphs above are incorporated herein.

**91.**

Defendants sold, offered to sell, and successfully solicited the sale to plaintiffs TIC interests in the Tower, which were securities within the meaning of the federal Securities laws, including Section 10(b) of the Exchange Act and Rule 10(b)-5.

**92.**

In connection with the sales and offers to sell the securities, defendants made use of the United States mail, interstate telephones, and the means and facilities of interstate commerce.

1

**93.**

2      In connection with the sales and offers to sell the securities, defendants (a) knowingly and
3  willfully employed devices, schemes, and artifices to defraud; (b) made untrue statements of material
4  fact or omitted to state material facts necessary in order to make the statements made, in light of the
5  circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses
6  of business which operated a fraud or deceit upon plaintiffs in violation of Section 10(b) of the
7  Exchange Act and Rule 10(b)-5, promulgated thereunder, by:

8      (a)    omitting to disclose that defendants would use the Reserve, which had been funded by
9  plaintiffs' investments, to make it appear that the Tower had a cash flow sufficient to pay plaintiffs
10 distributions;

11     (b)    omitting to disclose that defendants would use the Reserve, which had been funded by
12 plaintiffs' investments, to make it appear that plaintiffs were receiving a return on their investment when
13 they were, in fact, receiving a return of their investment;

14     (c)    omitting to disclose that the Subscription Material's projected annual distributions of a
15 6.0% return on investment for the Tower was impossible to achieve at the price defendants were selling
16 the building to plaintiffs;

17     (d)    representing that defendants had a track record of producing successful results for
18 investors in other TIC syndications they had arranged;

19     (e)    representing that defendants had a track record of producing positive cash flows for
20 investors in other TIC syndications arranged by defendants in the amounts represented to plaintiffs;

21     (f)    omitting to disclose that defendants had repaid investors in other TIC syndications out of
22 those investors' reserves;

23     (g)    omitting to disclose that defendants had not achieved returns on their prior TIC
24 syndications as high as the projects contained in the Subscription Materials provided to plaintiffs;

25     (h)    omitting to disclose that defendants' prior TIC properties had not resulted in a significant
26 return on investment for their TIC investors;

27     (i)    omitting to disclose that defendants had encountered material problems in their prior TIC
28 syndications;

1    (j)    omitting to disclose and misrepresenting necessary and planned capital improvements for
2    the Tower;

3    (k)    omitting to disclose that the Tower would incur significant additional costs, such as
4    earthquake insurance, which defendants omitted from their projections for the Tower to make the
5    projections appear more positive than they were;

6    (l)    failing to provide all plaintiffs with a copy of the Addendum purporting to disclose that
7    defendants might retain an interest in the Tower through Defendant USA Sunset Media, LLC, which
8    provided defendants with veto power over important decisions affecting the Tower;

9    (m)    representing that defendants had not decided whether to retain an interest in the Tower
10   through Defendant USA Sunset Media, LLC, when they had either already acquired interests or intended
11   to do so in order to cement their control over management of the Tower;

12   (n)    representing that projections of cash flow were consistent with the provisions of the
13   Management Agreement when they were not;

14   (o)    representing that investing in the Tower was a "safe" investment;

15   (p)    representing that the Tower was guaranteed to produce annual returns of 6.0%;

16   (q)    representing that annual distributions of 6% return on investment returns was a
17   "conservative" projection;

18   (r)    representing that asbestos in the Tower had been 85% abated and that the sponsors were
19   going to keep $5 million "on the table" to make sure the asbestos had been abated; and

20   (s)    orally representing that should defendants retain an interest in the Tower, they would not
21   have voting rights (or, to other plaintiffs, that defendants would not retain any interest).

22                                          **94.**

23   Defendants knew, or were reckless in not knowing, of the conduct described above.

24                                          **95.**

25   Plaintiffs did not know the truth of defendants' misrepresentations and omissions.

26                                          **96.**

27   Plaintiffs justifiably and reasonably relied on defendants' misrepresentations and omissions in
28   purchasing the securities.

**97.**

Had plaintiffs known the true facts, plaintiffs would not have made any investment with defendants or purchased the securities.

**98.**

As a direct and proximate result of the misrepresentations, concealment, and fraud of defendants, and of plaintiffs investing in the securities, plaintiffs suffered loss and damages exceeding $4 million in an amount to be proven at trial.

**99.**

As a result of the willful fraud and malice practiced on plaintiffs by defendants, plaintiffs are entitled to punitive damages in the additional amount of ten times actual damages.

**100.**

Plaintiffs are entitled to recover their reasonable attorney fees.

## SECOND CLAIM FOR RELIEF

### (California Securities Law Violations – All Defendants)

**101.**

The allegations and averments in each of the paragraphs above are incorporated herein.

**102.**

Defendants sold or successfully solicited the sale to plaintiffs of their TIC interests, which were securities within the meaning of CAL. CORP. CODE § 25019.  Plaintiffs continue to own those securities.

**103.**

In selling or successfully soliciting the sale of the securities, defendants violated CAL. CORP. CODE §§ 2540 and 25401 by making the following untrue statements of material fact:

(a)     that the Subscription Material's projected positive cash flow of 6.0% for the Tower was achievable at the price defendants were selling the building to plaintiffs;

(b)     that defendants had a track record of producing successful results for investors in other TIC syndications they had arranged;

(c)     that defendants had a track record of producing positive cash flows for investors in other TIC syndications arranged by defendants in the amounts represented to plaintiffs;

1    (d)    that projections of cash flow were consistent with the provisions of the Management

2    Agreement;

3    (e)    that defendants had not decided whether to retain an interest in the Tower through

4    Defendant USA Sunset Media, LLC, when defendants had either already acquired interests or intended

5    to do so in order to cement their control over management of the Tower;

6    (f)    that investing in the Tower was a "safe" investment;

7    (g)    that the Tower was guaranteed to produce annual returns of 6%;

8    (h)    that annual distributions of 6% return on investment returns was a "conservative"

9    projection; and

10   (i)    that asbestos in the Tower had been 85% abated and that the sponsors were going to keep

11   $5 million "on the table" to make sure the asbestos had been abated.

12                                              **104.**

13   In selling or successfully soliciting the sale of the securities, defendants violated CAL. CORP.

14   CODE §§2540 and 25401 by omitting to make the following statements of material fact, which in light of

15   the circumstances were required to make their representations not misleading:

16   (a)    that defendants would use the Reserve, which had been funded by plaintiffs' investments,

17   to make it appear that the Tower had a cash flow sufficient to pay plaintiffs distributions;

18   (b)    that defendants would use the Reserve account, which had been funded by plaintiffs'

19   investments, to make it appear that plaintiffs were receiving a return *on* their investment when they

20   were, in fact, receiving a return *of* their investment;

21   (c)    that defendants had repaid investors in other TIC syndications out of those investor's

22   reserves;

23   (d)    that defendants had not achieved returns on their prior TIC syndications as high as the

24   projections contained in the Subscription Materials provided to plaintiffs;

25   (e)    that defendants' prior TIC properties had not resulted in a significant return on

26   investment for their TIC investors;

27   (f)    that defendants had encountered material problems in their prior TIC syndications;

28   (g)    that there would be extensive renovations, paid for from the Reserve;

1     (h)     that the Tower would incur significant additional costs, such as earthquake insurance,

2 which defendants omitted from their projections for the Tower to make the projections appear more

3 positive than they were;

4     (i)     that defendants would to retain an interest in the Tower through Defendant USA Sunset

5 Media, LLC, which provided defendants with veto power over important decisions affecting the Tower.

6 **105.**

7 Plaintiffs did not know the truth of defendants' misrepresentations and omissions.

8 **106.**

9 Plaintiffs justifiably and reasonably relied on defendants' misrepresentations and omissions in

10 purchasing the securities.

11 **107.**

12 Plaintiff will, at their election, tender the securities to defendants before entry of judgment

13 pursuant to CAL. CORP. CODE § 25501.

14 **108.**

15 As a result of defendants' violations of CAL. CORP. CODE §§ 25400 and 25401, plaintiffs are

16 entitled, pursuant to CAL. CORP. CODE § 25501, to rescission and to recover the amounts paid for their

17 respective interests and all related fees and commissions provided to defendants, together with interest at

18 the legal rate from the date of purchase.

19 **109.**

20 Plaintiffs are entitled to recover their reasonable attorney fees under CAL. CORP. CODE § 25501.

21 **110.**

22 To the extent any defendant is not liable under CAL. CORP. CODE §§ 25500 and 25501, that

23 defendant is liable as a person who either controlled and induced the other defendants to violate CAL.

24 CORP. CODE §§ 25500 and 25501, or provided substantial assistance to the other defendants in violating

25 CAL. CORP. CODE §§ 25500 AND 25501, and is liable to the same extent as the other defendants.

26 **THIRD CLAIM FOR RELIEF**

27 **(Racketeer Influenced and Corrupt Organizations Act ("RICO") – All Defendants)**

28

**111.**

The allegations and averments alleged in each paragraph above are incorporated herein.

**112.**

Plaintiffs have alleged the RICO and RICO conspiracy claims that follow as alternative claims that plaintiffs will pursue in the event the court deems that plaintiffs' TIC interests do not constitute securities.

**113.**

**(The Enterprise and Enterprise Entities)**

**114.**

Defendants, at all times relevant herein, acted and participated individually and in concert, and each aided and abetted the other, in connection with the creation and maintenance of the Enterprise and commission of the racketeering acts and other wrongful acts alleged below, in violation of 18 U.S.C. §1964(a), (c), and (d).

**115.**

The known facilities, ownership interests and managerial control of entities that are instrumentalities of the Enterprise (hereafter referred to as "Enterprise Entities") described below are, upon information and belief, as follows:

| ENTITY | OWNERS | PERCENTAGES |
|---|---|---|
| U.S. Advisor, LLC | Fitzgerald<br>Schwartz<br>McCrae<br>John Does | unknown |
| U.S. Select Securities LLC | U.S. Advisor, LLC | 100% |
| U.S. Commercial LLC<br>(now Strategic Capital Holdings, LLC) | U.S. Advisor, LLC | 100% |
| USA Sunset Media, LLC | U.S. Advisor, LLC<br>Fitzgerald<br>Schwartz<br>McCrae<br>John Does | unknown |
| CB Richard Ellis/U.S. Advisor, LLC<br>("CBREI/USA, LLC") | U.S. Advisor, LLC<br>CB Richard Ellis Invest. LLC | 50%<br>50% |
| USA Sunset Media Management, LLC | CBREI/USA LLC | 100% |

**116.**

Defendants conducted an Enterprise through a pattern of racketeering activity in interstate commerce involving past and on-going predicate acts of wire and mail fraud which amount to or otherwise constitute a threat of continuing racketeering activity in violation of 18 U.S.C. § 1962(a) and (c).

**117.**

Defendants, and each of them, conspired to conduct an Enterprise through a pattern of racketeering activity in interstate commerce involving past and on-going predicate acts of wire and mail fraud which amount to or otherwise constitute a threat of continuing racketeering activity in violation of 18 U.S.C. § 1962(a), (c), and (d).

**118.**

At all times relevant herein, the defendants, and each of them, were knowing and active participants in an Enterprise conducted through a pattern of racketeering activity involving predicate acts of wire and mail fraud which amount to or otherwise constitute a threat of continuing racketeering activity in violation of 18 U.S.C. § 1962(a), (c), and (d).

**119.**

The Enterprise consists of a group of individuals (the defendants) and organizations associated in fact and is of open-ended continuity which, by its nature and as shown by its past unlawful conduct, projects into the future with a threat of repetition. It has a structure for making decisions, both hierarchical and consensual, and provides mechanisms for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis, including a system of authority. It exists beyond that which is merely necessary to commit the predicate acts of racketeering. Within this Enterprise is a system of authority guiding its operations. The oversight and coordination of the commission of the predicate offenses and other activities, as alleged herein, on an on-going basis separates the Enterprise here from the pattern of racketeering in which it engages.

**120.**

The Enterprise conducted by defendants in which they were employed or with which they were associated exists as an entity separate and apart from the pattern of racketeering activity in which it engages based on the following facts and circumstances:

A. Kevin Fitzgerald is the titular leader of the Enterprise. He uses his authority as Chief Executive Officer and controlling owner of U.S. Advisors LLC, as well as his authority to control the other Enterprise Entities through his control of U.S. Advisors, LLC, to make substantial profits by inducing, through material misstatements and omissions, investors seeking 1031 exchange benefits to invest in TIC ownership in buildings the Enterprise Entities syndicate. Fitzgerald, on information and belief, personally or through ownership of another entity, is also an owner of USA Sunset Media LLC.

B. H. Michael Schwartz, upon information and belief, is an officer and an owner in U.S. Advisors, LLC and acts as Fitzgerald's second in command. Schwartz was the Vice Chairman of U.S. Commercial LLC and the registered principal of U.S. Select Securities LLC. Like Fitzgerald, he uses the Enterprise Entities to induce, through material misstatements and omissions, investors seeking 1031 exchange benefits to invest in TIC ownership through the Enterprise Entities. Schwartz, on information and belief, personally or through ownership of another entity, is also an owner of USA Sunset Media, LLC.

C. Glen McCrae was the President of U.S. Select Securities LLC and was responsible for oversight of all regulatory and financial matters for U.S. Select as a broker dealer for TIC investments. He used U.S. Select and the other Enterprise Entities to induce to induce, through material misstatements and omissions, investors seeking 1031 exchange benefits to invest in TIC ownership through the Enterprise Entities.

D. Paula Mathews is a director of U.S. Commercial LLC; Gavin Hinze acts on behalf of the USA Sunset Media Management LLC. They use their authority from those positions to execute the scheme to induce investors to invest in Enterprise TIC projects by means of material misrepresentations and omissions.

E. U.S. Advisor, LLC is an entity member of the Enterprise. It is the controlling entity that wholly owns U.S. Select Securities LLC and U.S. Commercial LLC, and 50% of CB Richard Ellis

1   Investors/U.S. Adviros, LLC, which wholly owned USA Sunset Media, LLC, which was the entity that

2   sold the TIC interests to plaintiffs.  In this instance, US Advisor, LLC may have also retained an interest

3   in the Tower through an investment interest in USA Sunset Media, LLC.  The proceeds from the

4   predicate acts are used by the Enterprise to increase its holdings in the Enterprise Entities and to

5   facilitate new TIC syndications to defraud other investors seeking 1031 exchanges.

6                                   **(Predicate Acts)**

7                                        **121.**

8          The separate predicate acts of wire and mail fraud committed by the Enterprise constitutes a

9   pattern of racketeering activity pursuant to 18 U.S.C. § 1961(1)(B) in violation of 18 U.S.C. § 1962(a),

10  (c) and (d).

11                                       **122.**

12         For the purpose of this claim, plaintiffs allege in the alternative that plaintiffs' TIC interests are

13  not securities.

14                                       **123.**

15         The known predicate acts involving misrepresentations, include the following:

16         (a)     Omitting to disclose that the Enterprise had used and intended to use the reserve, for TIC

17  buildings, funded by the TIC owners, to make it appear that the TIC investors were receiving a return on

18  their investment when they were not;

19         (b)     Omitting to disclose to potential TIC investors that the Enterprise had repaid investors in

20  other TIC syndications out of those investors' reserves;

21         (c)     Misrepresenting the Enterprise's track record and history of performance success with

22  other similar transactions by disclosing and implying a history of positive results that were not true;

23         (d)     Misrepresenting the performance on previous TIC syndications in order to entice other

24  TIC investors to invest in future Enterprise projects;

25         (e)     Omitting to disclose negative information that would be necessary to make the

26  Enterprise's positive statements about its track record and history of performance with other similar

27  transactions not misleading;

28

1    (f)     Concealing and misrepresenting the amount of fees and commissions to be paid to
2   defendants;

3    (g)     Omitting significant expenditures, such as insurance premiums for TIC properties, from
4   projections in order to make projected cash flows appear more positive;

5    (h)     Making fraudulent financial projections about TIC projects; and

6    (i)     Concealing that defendants intended to maintain veto power over important decisions
7   regarding investment properties after its syndication to TIC investors or representing the defendants
8   would retain no interest at all.

**124.**

10    The method of the commission of the predicate acts alleged above was related and continuous,
11   and involved the following fraudulent schemes, practices and actions:

**(Damages)**

**125.**

14    The commission of the predicate acts alleged above, which were conducted as a pattern of
15   racketeering activity through an Enterprise, have proximately caused injuries, damages and losses to
16   plaintiffs exceeding $4 million in an amount to be proven at trial.

**126.**

18    Plaintiffs are entitled to have all damages awarded to them trebled and be awarded all their
19   attorney fees incurred in prosecuting this action pursuant to 18 U.S.C. § 1964(c) by virtue of defendants'
20   violation of 18 U.S.C. § 1962(a), (c) and (d).

**127.**

22    Plaintiffs are entitled to an award of pre-judgment and post-judgment interest upon the economic
23   damages which they are found to have suffered as a result of defendants' conduct.

**FOURTH CLAIM FOR RELIEF**

**(Conspiracy to Violate RICO)**

**128.**

27    The allegations and averments in each paragraph above are incorporated herein.

**129.**

The defendants are an Enterprise that conspired to engage in a pattern of racketeering activity to commit the predicate acts alleged above in violation of 18 U.S.C. § 1962(a), (c) and (d).

**130.**

Plaintiffs have suffered injuries, damages and losses as alleged above that were proximately caused by the unlawful actions of defendants in violation of 18 U.S.C. § 1962(a), (c) and (d).

**131.**

Plaintiffs are entitled to the relief demanded in the Prayer for Relief from Defendants.

**FIFTH CLAIM FOR RELIEF**

**(Common Law Fraud – All Defendants)**

**132.**

The allegations and averments in each paragraph above are incorporated herein.

**133.**

In selling plaintiffs their TIC interests in the Tower, defendants made the following untrue statements of material fact:

(a)     that the Subscription Material's projected positive cash flow of 6.0% for the Tower was achievable at the price defendants were selling the building to plaintiffs;

(b)     that defendants had a track record of producing successful results for investors in other TIC syndications they had arranged;

(c)     that defendants had a track record of producing positive cash flows for investors in other TIC syndications arranged by defendants in the amounts represented to plaintiffs;

(d)     that projections of cash flow were consistent with the provisions of the Management Agreement;

(e)     that defendants had not decided whether to retain an interest in the Tower through Defendant USA Sunset Media, LLC, when defendants had either already acquired interests or intended to do so in order to cement their control over management of the Tower;

(f)     that investing in the Tower was a "safe" investment;

(g)     that the Tower was guaranteed to produce annual returns of 6%;

1 (h) that annual distributions of 6% return on investment was a "conservative" projection; and

2 (i) that asbestos in the Tower had been 85% abated and that the sponsors were going to keep

3 $5 million "on the table" to make sure the asbestos had been abated.

**134.**

5 In selling plaintiffs their TIC interests in the Tower, defendants omitted to make the following

6 statements of material fact, which in light of the circumstances were required to make their

7 representation not misleading:

8 (a) that defendants would use the Reserve, which had been funded by plaintiffs' investments,

9 to make it appear that the Tower had a cash flow sufficient to pay plaintiffs distributions;

10 (b) that defendants would use the Reserve, which had been funded by plaintiffs' investments,

11 to make it appear that plaintiffs were receiving a return on their investment when they were, in fact,

12 receiving a return of their investment;

13 (c) that defendants had repaid investors in other TIC syndications out of those investors'

14 reserves;

15 (d) that defendants had not achieved returns on their prior TIC syndications as high as the

16 projections contained in the Subscription Materials provided to plaintiffs;

17 (e) that defendants' prior TIC properties had not resulted in a significant return on

18 investment for their TIC investors;

19 (f) that defendants had encountered material problems in their prior TIC syndications;

20 (g) that the Tower would not receive extensive renovations, paid from reserves;

21 (h) that the Tower would incur significant additional costs, such as earthquake insurance,

22 which defendants omitted from their projections for the Tower to make the projections appear more

23 positive than they were; and

24 (i) that defendants would to retain an interest in the Tower through Defendant USA Sunset

25 Media, LLC, which provided defendants with veto power over important decisions affecting the Tower.

26

27

28

1

**135.**

2      These statements, representations, and omissions were made, or the information was supplied, to

3 plaintiffs by defendants with knowledge of the falsity or with knowledge of the misleading nature of the

4 statements or in reckless disregard to the truth of and completeness of the statements.

5

**136.**

6      Plaintiffs were ignorant of the truth.

7

**137.**

8      Defendants made or delivered the statements or made the omissions to plaintiffs for the purpose

9 of inducing plaintiffs to invest in the Tower.

10

**138.**

11      Plaintiffs relied on the false or misleading statements and omissions and did invest in TIC

12 interests in the Tower.

13

**139.**

14      Plaintiffs reliance was reasonable.

15

**140.**

16      As a direct and proximate result of the misrepresentations and omissions, plaintiffs suffered loss

17 and damages exceeding $4 million in an amount to be proven at trial.

18

**141.**

19      As a result of the willful fraud and malice practiced on plaintiffs by defendants, plaintiffs are

20 entitled to punitive damages in the additional amount of ten times actual damages.

21

**142.**

22      Plaintiffs are entitled to recover of their reasonable attorney fees.

23

**SIXTH CLAIM FOR RELIEF**

24

**(Civil Conspiracy – All Defendants)**

25

**143.**

26      The allegations and averments in each paragraph above are incorporated herein.

27

28

**144.**

Defendants had a plan or common design to defraud plaintiffs through formation of the Sunset Media Enterprise Entities and use of the Sunset Media Enterprise as alleged in Paragraphs 118 through 126.

**145.**

Defendants entered into the conspiracy with an intent to aid in the commission of the fraud perpetrated upon plaintiffs in the manner specified in Paragraphs 118 through 126.

**146.**

As a result of the conspiracy, plaintiffs were the victims of fraud in the purchase of their investments in the Tower as a consequence of the wrongful acts alleged in Paragraphs 135 and 136.

**147.**

As a direct and proximate result of the wrongful acts undertaken in furtherance of the conspiracy, plaintiffs suffered loss and damages exceeding $4 million in an amount to be proven at trial.

**148.**

As a result of the willful fraud and malice practiced on plaintiffs by defendants, plaintiffs are entitled to punitive damages in the additional amount of ten times actual damages.

**149.**

Plaintiffs are entitled to recover of their reasonable attorney fees.

### SEVENTH CLAIM FOR RELIEF

### (Disgorgement – All Defendants)

**150.**

The allegations and averments in each paragraph above are incorporated herein.

**151.**

As set forth above, defendants received payments of commissions and other fees related to the solicitation of investors for the Sunset Media Enterprise. The money used to pay the commissions and other fees to defendants was ill-gotten gains from the sales of securities to unsuspecting investors in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder, and CAL. CORP. CODE §§ 25400, 25401, 25500, and 25501. The funds were used to

1  compensate defendants' efforts to solicit new investors and to perpetuate the Sunset Media Enterprise's

2  fraudulent scheme. Defendants have no legitimate claim to the commissions or fees, as the commissions

3  or fees were paid to them specifically for their role in the illegal sales of the securities.

**152.**

5  It would be unjust and inequitable for defendants to retain the fees and commissions they

6  wrongfully received in connection with the Sunset Media Enterprise.

**153.**

8  To ensure that defendants do not profit from and are not unjustly enriched by the commissions

9  they received, any defendants that received commissions, fees, or a portion thereof should be required to

10  disgorge the commissions and fees received with prejudgment interest on any cash proceeds, plus

11  interest.

## EIGHT CLAIM FOR RELIEF

### (Unjust Enrichment – All Defendants)

**154.**

15  The allegations and averments in each paragraph above are incorporated herein.

**155.**

17  Each of the defendants received a benefit – the payment of commissions and fees related to the

18  solicitation of investors for the Sunset Media Enterprise – which, under the circumstances, would be

19  unjust for them to retain. In addition, some of the money used to pay the commissions and fees to

20  defendants represents ill-gotten gains from the sales of securities to unsuspecting investors in violation

21  of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder,

22  and CAL. CORP. CODE §§ 25400, 25401, 25500, and 25501.

**156.**

24  To ensure that defendants are not unjustly enriched by the commissions or fees they received,

25  each defendant should be required to repay the commissions or fees received with prejudgment interest

26  on any cash proceeds.

27  ///

28

1

## NINTH CLAIM FOR RELIEF

2

### (Constructive Trust)

3

**157.**

4

The allegations and averments in each paragraph above are incorporated herein.

5

**158.**

6

Defendants took unlawful possession and control of the monies belonging to plaintiffs and have

7

used those monies for their own use and enjoyment.

8

**159.**

9

Plaintiffs are entitled to a constructive trust on all real and personal property owned or controlled

10

by defendants that was acquired by or which received a benefit from, in whole or in part, the monies of

11

plaintiffs unlawfully converted by defendants.

12

## TENTH CLAIM FOR RELIEF

13

### (Breach of Contract against Defendant USA Sunset Media, LLC)

14

**160.**

15

The allegations and averments in each paragraph above are incorporated herein.

16

**161.**

17

Plaintiffs entered into identical Purchase Agreements with Defendant USA Sunset Media LLC

18

by which they purchased their interests in the Tower. Plaintiffs have performed their obligations under

19

the Purchase Agreement.

20

**162.**

21

In section 6.1.1 (h) of the Purchase Agreement, Defendant USA Sunset Media LLC made the

22

following Representation and Warranty: "(h) all documents, instruments, and other materials provided

23

to Buyer, by Seller, in conjunction with this transaction, including, but not limited to the Memorandum,

24

are true and correct in all material respects, and do not contain any material misstatement of a material

25

fact or fail to state any material fact required to be stated therein or necessary to make any statements

26

contained therein, in light of the circumstances in which they are made, not misleading."

27

28

1

**163.**

2      Defendant USA Sunset Media, LLC breached the provision by making the material

3  misstatements and material omissions specified above.

4

**164.**

5      As a result of Defendant USA Sunset Media LLC's breach, plaintiffs have suffered damages

6  exceeding $4 million in an amount to be proven at trial.  These damages were reasonably foreseeable at

7  the time the contract was made.

8

**ELEVENTH CLAIM FOR RELIEF**

9

**(Breach of Contract against Defendant USA Sunset Media Management LLC)**

10

**165.**

11      The allegations and averments in each paragraph above are incorporated herein.

12

**166.**

13      Plaintiffs entered into a Co-Ownership Agreement with Defendant USA Sunset Media

14  Management LLC establishing the terms of their ownership of the Tower.  Plaintiffs have performed

15  their obligations under the Co-Ownership Agreement.  The Co-Ownership Agreement specified that

16  Defendant USA Sunset Media Management, LLC was the "Manager" and plaintiffs were "the Co-

17  Owners" under the agreement.

18

**167.**

19      Defendants' mismanagement of the Tower, as described above, constituted a breach of this

20  Agreement, including the provisions that follow.

21

**168.**

22      In section 3.1 of the Co-Ownership Agreement, Defendant USA Sunset Media Management

23  LLC agreed that "all income, revenue and other cash flow derived from operation of the Property, net of

24  such amounts as may be reasonably determined by the Manager for reasonable reserves for operations,

25  repairs or improvements in accordance wit the Management Agreement, shall be disbursed by the

26  Manager to the Co-Owners, pro rata, in accordance with their respective Interests, on a quarterly basis."

27

28

**169.**

Defendant USA Sunset Media Management, LLC breached the provision by failing to maintain a reasonable reserve and paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve.

**170.**

As a result of Defendant USA Sunset Media Management LLC's breach, plaintiffs have suffered damages exceeding $4 million in an amount to be proven at trial. These damages were reasonably foreseeable at the time the contract was made.

## TWELFTH CLAIM FOR RELIEF

## (Breach of Contract – Implied Duty of Good Faith and Fair Dealing against Defendant USA Sunset Media Management LLC)

**171.**

The allegations and averments in each paragraph above are incorporated herein.

**172.**

The contractual duties between Defendant USA Sunset Media Management LLC and plaintiffs arising out of the Co-Ownership Agreement imposed an implied covenant of good faith and fair dealing in performance and enforcement of the contract. Plaintiffs have performed their obligations under the Co-Ownership Agreement.

**173.**

Defendant USA Sunset Media Management LLC breached the implied covenant of good faith and fair dealing by:

(a)     paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve;

(b)     failing to disclose that it was paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve;

(c)     failing to communicate with plaintiffs about disbursements when asked;

(d)     failing to make promised capital improvements and instead depleting the Reserve;

1    (e)    failing to use reasonable efforts to retain tenants, and failing to fully inform plaintiffs of
2 their retention efforts; and

3    (f)    misrepresenting to plaintiffs that the Reserve was being used as a "temporary cash timing
4 issue."

5                                                        **174.**

6        Defendant USA Sunset Media Management, LLC's conduct was inconsistent with plaintiffs'
7 expectations and has interfered with plaintiffs' ability to properly receive the benefits of the parties'
8 contract.

9                                                        **175.**

10       As a result of Defendant USA Sunset Media Management, LLC's breach, plaintiffs have
11 suffered damages exceeding $4 million in an amount to be proven at trial. These damages were
12 reasonably foreseeable at the time the contract was made.

13                                          **THIRTEENTH CLAIM FOR RELIEF**

14          **(Breach of Contract against Defendant USA Sunset Media Management, LLC)**

15                                                       **176.**

16       The allegations and averments in each paragraph above are incorporated herein.

17                                                       **177.**

18       Plaintiffs entered into a Management Agreement with Defendant USA Sunset Media
19 Management, LLC establishing the terms of the management of the Tower. Plaintiffs have performed
20 their obligations under the Management Agreement. The Management Agreement specified that
21 Defendant USA Sunset Media Management, LLC was the "Manager" and plaintiffs were "the Co-
22 Owners" under the agreement.

23                                                       **178.**

24       Defendant's mismanagement of the Tower, as described in each of the paragraphs above,
25 constituted a breach of this Agreement, including the provisions that follow.

26                                                       **179.**

27       Section 2.2 of the Management Agreement provides: "The Manager shall manage, operate, and
28 maintain the Property in an efficient economic and satisfactory manner and shall manage the

1  performance of everything reasonably necessary for the proper operation of the Property for the tenant
2  thereof subject to (a) applicable governmental requirements, and (b) the terms and provisions of this
3  Agreement. At the expenses of the Co-Owners, based on their undivided completion of such repairs as
4  may be required and shall generally do and perform, or cause to be done or performed, all things
5  necessary required or desirable for the proper and efficient management, operation, and maintenance of
6  the Property, provided each of the Co-Owners, based on their undivided interests in the Property, in a
7  manner reasonably satisfactory to the Manager, makes available to the Manager sufficient sums to pay
8  the costs thereof. The Manager shall perform all services in a diligent and professional manner."

9                                           **180.**

10     Section 2.6(b) of the Management Agreement provides, in pertinent part: "The Manager shall
11 use commercially reasonable efforts to obtain tenants for all rental units in the Property and to renew
12 leases and rental agreements...."

13                                          **181.**

14     In section 2.13 of the Management Agreement, Defendant USA Sunset Media Management,
15 LLC agreed to "provide information about the Property necessary for the preparation and filing by each
16 of the Co-Owners of their individual income or other tax returns required by any governmental
17 authority, including annual statements, identifying each Co-Owner's undivided percentage of all
18 expenses paid and income received by such Co-Owner."

19                                          **182.**

20     Section 4.1 of the Management Agreement provides: "The Manager shall maintain adequate and
21 separate books and records for the Property with the entries supported by sufficient documentation to
22 ascertain their accuracy with respect to the Property." Section 4.2 of the Management Agreement
23 provided, "On or about the 20th day after the end of each calendar quarter, the Manager shall furnish to
24 the Co-Owners a report of all material transactions occurring during such prior quarter."

25                                          **183.**

26     Section 9.5 of the Management Agreement provides, in pertinent part: "The Co-Owners hereby
27 grant the Manager, or an affiliate, the exclusive right to sell the Property on terms acceptable to the Co-
28 Owners as described herein. If the Manager obtains a buyer for the Property (or portion thereof) on

1  terms approved by the Co-Owners, the Manager shall be entitled to receive a selling commission (the
2  "Selling Commission") from the Co-Owners equal to (i) up to 6% of the gross sales price of the Property
3  if a third party real estate agent or broker assists in the sale or (ii) up to 4% maximum of the gross sale
4  price of the Property if no third party real estate agent or broker assists in the sale."

**184.**

6  Section 9.5 of the Management Agreement provides, in pertinent part: "The Manager, or an
7  affiliate, shall receive, for its services in managing the Property in accordance with the terms of this
8  Agreement, a monthly management fee ("the Management Fee") of up to 6% of Gross Revenues . . .,
9  which Management Fee shall be in addition to out-of-pocket and on-site personnel costs that are
10  reimbursable pursuant to Article 7 and the other fees provided in this Agreement."

**185.**

12  The Management Agreement delegates to the Manager exclusive responsibility for the operation
13  of the Tower, and imposes on the Manager responsibility to pay all costs associated with such operation.

**186.**

15  Defendant USA Sunset Media Management, LLC breached the Management Agreement in at
16  least the following ways:

17  (a)     failing to provide plaintiffs with records from which the plaintiffs could ascertain that the
18  "disbursements" they were receiving were actually being paid out of the Reserve that they had funded;

19  (b)     failing to use commercially reasonable efforts to obtain tenants for all rental units in the
20  Property and to renew leases and rental agreements;

21  (c)     failing to make promised capital improvements and instead depleting the Reserve; and

22  (d)     insisting on and taking fees in excess of the agreement, including excess fees in
23  connection with a proposed sale of the Tower that caused the proposed sale to fail.

**187.**

25  As a result of Defendant USA Sunset Media Management, LLC's breaches, plaintiffs have
26  suffered damages exceeding $4 million in an amount to be proven at trial.  These damages were
27  reasonably foreseeable at the time the contract was made.

## FOURTEENTH CLAIM FOR RELIEF

### (Breach of Contract – Implied Duty of Good Faith and Fair Dealing against Defendant USA Sunset Media Management, LLC)

**188.**

The allegations and averments in each paragraph above are incorporated herein.

**189.**

The contractual duties between Defendant USA Sunset Media Management, LLC and plaintiffs arising out of the Management Agreement imposed an implied covenant of good faith and fair dealing in performance and enforcement of the contract. Plaintiffs have performed their obligations under the Co-Ownership Agreement.

**190.**

Defendant USA Sunset Media Management, LLC breached the implied covenant of good faith and fair dealing by:

(a)  paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve;

(b)  failing to inform plaintiffs that it was paying out to plaintiffs disbursements from the Reserve from post-tax dollars already invested by plaintiffs and leading plaintiffs to believe that the disbursements were pre-tax returns on their investments for which taxes were due to governmental authorities;

(c)  failing to disclose that it was paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve;

(d)  failing to communicate with plaintiffs about disbursements when asked;

(e)  failing to make promised capital improvements and instead depleting the Reserve;

(f)  failing to use reasonable efforts to retain tenants, and failing to fully inform plaintiffs of their retention efforts;

(g)  misrepresenting to plaintiffs that the Reserve was being used as a "temporary cash timing issue"; and

(h)  charging and insisting on excessive fees.

**191.**

Defendant USA Sunset Media Management, LLC's conduct was inconsistent with plaintiffs' expectations and has interfered with plaintiffs' ability to properly receive the benefits of the parties' contract.

**192.**

As a result of Defendant USA Sunset Media Management, LLC's breach, plaintiffs have suffered damages exceeding $4 million in an amount to be proven at trial. These damages were reasonably foreseeable at the time the contract was made.

**FIFTEENTH CLAIM FOR RELIEF**

**(Breach Of Fiduciary Duty against USA Sunset Media Management, LLC)**

**193.**

The allegations and averments in each paragraph above are incorporated herein.

**194.**

In its capacity as manager of the Tower, Defendant USA Sunset Media Management, LLC was in a position of trust and confidence with respect to plaintiffs in the management, operation, and financial control of the Tower. As a consequence, Defendant USA Sunset Media Management, LLC owed a fiduciary duty to plaintiffs, including the duty of full disclosure.

**195.**

The Management Agreement purports to eliminate a fiduciary duty to plaintiffs. The purported waiver is void under California law, which prohibits contractual waivers of fiduciary duties.

**196.**

Defendant USA Sunset Media Management, LLC breached its fiduciary duty to plaintiffs by:

(a)     paying out to plaintiffs disbursements from the Reserve that were disguised as returns on their investment, instead of returns of the Reserve;

(b)     failing to inform plaintiffs that it was paying out to plaintiffs disbursements from the Reserve from post-tax dollars already invested by plaintiffs and leading plaintiffs to believe that the disbursements were pre-tax returns on their investments for which taxes were due to governmental authorities;

1       (c)    failing to disclose that it was paying out to plaintiffs disbursements from the Reserve that

2   were disguised as returns on their investment, instead of returns of the Reserve;

3       (d)    failing to communicate with plaintiffs about disbursements when asked;

4       (e)    failing to make promised capital improvements and instead depleting the Reserve;

5       (f)    failing to use reasonable efforts to retain tenants, and failing to fully inform plaintiffs of

6   their retention efforts;

7       (g)    misrepresenting to plaintiffs that the Reserve was being used as a "temporary cash timing

8   issue"; and

9       (h)    charging and insisting on excessive fees.

10  **197.**

11  As a result of Defendant USA Sunset Media Management, LLC's breach, plaintiffs have

12  suffered damages exceeding $4 million in an amount to be proven at trial.

13  **198.**

14  As a result of the willful fraud and malice practiced on plaintiffs by defendants, plaintiffs are

15  entitled to punitive damages in the additional amount of ten times actual damages.

16  **SIXTEENTH CLAIM FOR RELIEF**

17  **(Negligent Misrepresentation against Defendant USA Sunset**

18  **Media Management LLC)**

19  **199.**

20  The allegations and averments in each paragraph above are incorporated herein.

21  **200.**

22  In its capacity as manager of the Tower, Defendant USA Sunset Media Management, LLC was

23  in a position of trust and confidence with respect to plaintiffs in the management, operation, and

24  financial control of the Tower. As a consequence, Defendant USA Sunset Media Management, LLC

25  and plaintiffs were in a special relationship. Defendant USA Sunset Media Management, LLC owed a

26  fiduciary duty to plaintiffs, including the duty of full disclosure and the duty not to make material

27  misrepresentations.

28

**201.**

The Management Agreement purports to eliminate a fiduciary duty to plaintiffs. The purported waiver is void under California law, which prohibits contractual waivers of fiduciary duties.

**202.**

Defendant USA Sunset Media Management, LLC made representations of material fact and non-disclosures:

(a)      that it was paying out disbursements that a reasonable owner would believe were payments from positive cash flow or returns on investments, instead of a return of the Reserve;

(b)      paying out disbursement without informing plaintiffs that they were receiving post-tax dollars already invested by plaintiffs, rather than pre-tax returns on their investments for which taxes were due to governmental authorities; and

(c)      misrepresenting to plaintiffs that the Reserve was being used as a "temporary cash timing issue."

**203.**

Defendant USA Sunset Media Management, LLC made the statements alleged in the paragraph above without reasonable grounds for believing they were true.

**204.**

Plaintiffs were ignorant of the truth.

**205.**

Defendant USA Sunset Media Management, LLC made those statements intending to induce plaintiffs reliance on the facts represented.

**206.**

Plaintiffs relied on statements.

**207.**

Plaintiffs' reliance was reasonable.

**208.**

As a consequence of Defendant USA Sunset Media Management, LLC's statements, plaintiffs have suffered damages exceeding $4 million in an amount to be proven at trial.

1

## SEVENTEENTH CLAIM FOR RELIEF

2

### (Negligence against Defendant USA Sunset Media Management, LLC)

3

**209.**

4

The allegations and averments in each paragraph above are incorporated herein.

5

**210.**

6

Defendant USA Sunset Media Management, LLC owed a duty of reasonable care to plaintiffs in

7

connection with its control and management of the Tower and plaintiffs' monies and accounts.

8

**211.**

9

Defendants breached their duty of care by their conduct by:   .

10

    (a)     failing to retain reasonable reserves for the Tower;

11

    (b)     paying out to plaintiffs disbursements from the Reserve that were disguised as returns on

12

their investment, instead of returns of the Reserve;

13

    (c)     failing to inform plaintiffs that it was paying out to plaintiffs disbursements from the

14

Reserve from post-tax dollars already invested by plaintiffs and leading plaintiffs to believe that the

15

disbursements were pre-tax returns on their investments for which taxes were due to governmental

16

authorities; and

17

    (d)     failing to make promised capital improvements and instead depleting the Reserve.

18

**212.**

19

Plaintiffs have suffered injuries, damages and losses as alleged above that were proximately

20

caused by the conduct of the defendants.

21

**213.**

22

Plaintiffs have suffered damages exceeding $4 million in an amount to be proven at trial.

23

### EIGHTEENTH CLAIM FOR RELIEF

24

### (Negligence and Gross Negligence – All Defendants)

25

**214.**

26

The allegations and averments in each paragraph above are incorporated herein.

27

28

1

**215.**

2

Defendants owed a duty of reasonable care to plaintiffs in connection with their due diligence in

3

creating the financial projections about plaintiffs' investments in the Tower.

4

**216.**

5

Defendants breached their duty of care by their conduct as alleged above.

6

**217.**

7

Defendants' breach was negligent or grossly negligent.

8

**218.**

9

Plaintiffs have suffered injuries, damages and losses as alleged above that were proximately

10

caused by the conduct of the defendants.

11

**219.**

12

Plaintiffs have suffered damages exceeding $4 million in an amount to be proven at trial.

13

**NINETEENTH CLAIM FOR RELIEF**

14

**(Contractual Attorney Fees and Costs)**

15

1.     The Purchase Agreement, Management Agreement, and Co-Ownership Agreement

16

contain provisions for prevailing-party attorney fees and costs.

17

2.     Plaintiffs are entitled to recovery of their reasonable attorney fees and costs in bringing

18

this action.

19

WHEREFORE, plaintiffs pray for judgment as follows:

20

1.     That plaintiffs be awarded damages in an amount in excess of $15.5 million.

21

2.     That plaintiffs be awarded punitive damages in the additional amount of ten times actual

22

damages.

23

3.     That plaintiffs be awarded their reasonable attorney fees and costs.

24

4.     That defendants be ordered to disgorge their fees and commissions paid by plaintiffs.

25

5.     That a constructive trust be placed over the fees and commissions paid to defendants by

26

plaintiffs.

27

6.     That plaintiffs be awarded rescission and the return of their investments.

28

7.     That prejudgment and post-judgment interest accrue on any judgment in plaintiffs' favor at the applicable statutory rate.

8.     For such other and further relief as the court deems proper.

Dated: February 11, 2011

GORDON-CREED, KELLEY,
HOLL & SUGERMAN, LLP

By:     _____
        Jeremy Sugerman
        Attorneys for Plaintiffs

Exhibit A

### FORM OF PURCHASE AGREEMENT

### PURCHASE AGREEMENT

### USA SUNSET MEDIA, LLC

THIS PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS ("**Agreement**") is made and effective as of the date Seller executes this Agreement ("**Effective Date**") by and between USA Sunset Media, LLC, a Delaware limited liability company ("**Seller**"), and the undersigned buyer ("**Buyer**"), with reference to the facts set forth below. All terms with initial capital letters not otherwise defined herein shall have the meanings set forth in the Defined Terms attached hereto as Exhibit "B" and incorporated herein.

      **A.**      Seller owns (or is under contract to purchase) fee simple title to certain real property located in Hollywood, California more particularly described in the property description attached hereto as Exhibit "A" and incorporated herein, and all improvements situated thereon, including Sunset Media Tower, an approximately 320,905-square-foot Class-A office and retail building (the "**Property**").

      **B.**      Pursuant to the Memorandum, Seller desires to sell an undivided interest in the Property to Buyer, and Buyer desires to buy an undivided interest in the Property (including all related contracts, leases, personal property, intangible property, and other property associated with the Property and owned by Seller (the "**Property Rights**") from Seller, on the terms and conditions set forth in this Agreement.

      **C.**      The Property shall, as of the Close of Escrow, be subject to the Loan Documents, the Co-Ownership Agreement and the Management Agreement, and in connection with the purchase contemplated herein, Buyer shall either be a party to, or assume, and acquire the Property subject to, the Loan Documents, the Co-Ownership Agreement and the Management Agreement.

      NOW, THEREFORE, in consideration of the mutual agreements set forth herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as set forth below.

      1.      <u>Agreement of Purchase and Sale.</u>

      1.1      <u>Purchase, Sale, General Assignment, and Purchase Price</u>. In consideration of the covenants herein contained:

      1.1.1      <u>Purchase and Sale</u>. Seller hereby agrees to sell, and Buyer hereby agrees to purchase, a _2.25_ % undivided tenant in common interest in the Property and all related Property Rights (the "**Interest**") at a purchase price ("**Purchase Price**") equal to $ _9,905,000_ , payable in the amount of $ _967,500_ in Cash, plus $6,000 in Cash for the Cash Deposit (as defined below), for a Cash total of $ _971,000_ (the "**Cash Portion**"), and $ _1,937,500_ , which is the pro rata portion of the Loan allocable to the Buyer's undivided tenant in common interest in the Property; and

      1.1.2      <u>General Assignment</u>. In conjunction with the sale of the Interest, at the Close of Escrow, Seller hereby transfers, sells, and assigns to Buyer, and Buyer hereby accepts the transfer, sale, and assignment of, the right, title, and interest of Seller, on a pro rata basis with the Seller and all other Co-Owners of the Property, in and to the Property Rights related to the Property, including but not limited to any rights Seller may have pursuant to the purchase agreement for the acquisition of the Property (the "**Acquisition Agreement**") between Seller and the prior owner of the Property from whom Seller is under contract to acquire the Property (the "**Prior Owner**"). By its acceptance hereof, at the Close of Escrow the Buyer agrees to be bound by, and to assume the Seller's obligations under, the Property Rights, on a joint and several basis with all other Co-Owners as to all obligations arising thereunder, from and after the Close of Escrow. This assignment and assumption is subject to all the rights and obligations of the existing tenants in and to the Property Rights under the terms of their respective leases with the Prior Owner as landlord thereunder. This assignment and assumption of the Property Rights shall survive the Close of Escrow and the recordation of the Deed and not be merged upon the recordation of the Deed. If for any reason the assignment of the Property Rights hereunder is ineffective, and as a result of such ineffectiveness

the Buyer is unable to enforce or assert the rights intended to be assigned to Buyer pursuant to this Subsection 1.1.2, then the Seller covenants and agrees, to the extent so requested by Buyer, to use all commercially reasonable efforts to enforce, or otherwise assert or obtain the benefits of, any such Property Rights for itself and for the Buyer. To the extent that there are any costs or expenses incurred by Seller in the enforcement of such Property Rights, which costs are not incurred as a result of an error or omission of Seller, Seller and Buyer, as well as all other Co-Owners, will split such costs and expenses based on their pro rata rights therein.

        1.2     <u>Payment</u>. Buyer shall pay the Purchase Price as follows:

        1.2.1     <u>Cash Deposit</u>. Upon execution and delivery of this Agreement by Buyer, which execution and delivery shall be deemed to constitute Buyer's offer to purchase the Interest, Buyer shall deliver to Seller (either directly or indirectly through Buyer's Accommodator identified on the Purchaser Questionnaire ("Accommodator")) a check payable to the order of "Wells Fargo Bank, N.A., as Escrow Agent for USA Sunset Media, LLC" in the amount of $6,000 (the "**Cash Deposit**"). Upon receipt of the Cash Deposit, the Company shall promptly remit the Cash Deposit to Escrow Agent. The Cash Deposit shall be placed by Escrow Agent in an interest-bearing account in accordance with the Escrow Agreement. The Cash Deposit shall be returned to Buyer or Buyer's Accommodator, as the case may be, at the Close of Escrow or applied against the cash portion of the Purchase Price, at Buyer's election; provided, however, that the Cash Deposit may be retained by Seller (together with interest accrued thereon) as its liquidated damages as provided in Subsection 5.1.

        1.2.2     <u>Cash Portion of the Purchase Price</u>. At least two (2) Business Days prior to the Close of Escrow, Buyer shall cause the Accommodator to deliver to Escrow Agent a check payable to "Wells Fargo Bank, N.A., as Escrow Agent for USA Sunset Media, LLC" in the amount of (i) the Cash Portion of the Purchase Price (less the amount of the Cash Deposit if Buyer elects to apply the Cash Deposit to the Cash Portion of the Purchase Price pursuant to Subsection 1.2.1 above), plus (ii) the Stipulated Closing Costs pursuant to Section 3 of this Agreement, including any Loan Fees due and payable by Buyer pursuant to Section 3 of this Agreement.

        1.2.3     <u>Notes and Deed to Secure Debt</u>. With respect to the remaining balance of the Purchase Price (the "**Loan Portion**"), Buyer shall assume, or otherwise take the Interest subject to, the Deed of Trust and the other Loan Documents pursuant to the Loan Documents or the Loan Assumption Documents, as the case may be. Within three (3) days after Seller's request, Buyer shall submit applications, financial information, and other items reasonably required by the Lender.

        1.3     <u>Buyer's Deliveries</u>. Prior to the Close of Escrow, Buyer shall execute, acknowledge (where appropriate) and deliver to Seller: (i) the Purchaser Questionnaire, (ii) as requested by Seller, either the Co-Ownership Agreement and the Management Agreement or the Assignment and Assumption of Co-Ownership Agreement and Management Agreement whereby Buyer assumes the obligations of Seller (or Seller's Assignee) under the Co-Ownership Agreement and the Management Agreement on a joint and several basis with the other Co-Owners, (iii) as requested by Seller, either the Loan Documents or the Loan Assumption, (iv) such other documents as may reasonably be requested by Seller, and (v) such other documents as may be required by the Transaction Documents or requested by the Lender.

        1.4     <u>Buyer's Intent to Exchange</u>. Buyer's acquisition of the Property is part of a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code, pursuant to an Exchange Agreement between Buyer and Buyer's Accommodator. Seller agrees to execute such documents or instruments as may be necessary or appropriate to evidence such exchange, provided Seller's cooperation in such regard shall be at no additional cost, expense, or liability whatsoever to Seller and that no additional delays in the scheduled Closing Date are incurred unless mutually agreed upon by all parties to this Agreement.

        1.5     <u>Advisors</u>. Buyer has consulted with a qualified attorney or other knowledgeable professional as to the tax and real estate issues associated with a purchase of the Interest.

        2.     <u>Opening and Close of Escrow</u>.

        2.1     <u>Opening of Escrow</u>. Upon acceptance of this Agreement by Seller, Seller shall deliver of Buyer's Cash Deposit to Escrow Agent. Seller shall enter into an Escrow Agreement with the Escrow Agent

consistent with the terms of this Agreement, and Buyer and Seller shall agree as necessary to execute additional escrow instructions not inconsistent with the terms of this Agreement if reasonably required by Escrow Agent.

 2.2 **Seller's Deliveries.** Prior to the Close of Escrow, Seller shall deposit with a third party escrow agent assisting with the Closing (the **"Additional Escrow Agent"**) applicable certificates regarding federal and state withholding taxes and execute other customary documents in the appropriate form conveying the Interest to Buyer as of the Close of Escrow.

 2.3 **Close of Escrow.** Escrow shall close on or before December 31, 2005 (the **"Closing Date"**) by (i) filing for record the Deed, and (ii) delivering funds and documents as set forth in Section 4 IF AND ONLY IF (a) all funds and instruments required pursuant to Sections 1 and 2 have been delivered to Seller or Escrow Agent, as the case may be, and (b) such closing occurs in connection with the acquisition of the Property by the Company. Seller is instructed to insert the Closing Date as the closing date of the other Transaction Documents.

 2.4 **Latest Closing.** If Escrow has not closed by 5:00 p.m. on the Business Day after the Closing Date, for any reason other than the default of either Buyer or Seller under this Agreement, either party may terminate this Agreement by written notice to the other party and to Escrow Agent. If this Agreement is so terminated for any reason other than the default of Buyer or Seller hereunder, (i) Buyer and Seller shall promptly execute and deliver any cancellation instructions reasonably requested by Escrow Agent; (ii) Escrow Agent shall return the Cash Deposit to Buyer or Buyer' Accommodator, as the case may be (without interest); and (iii) Buyer and Seller shall be released from their obligations under this Agreement, other than any obligations of Buyer that survive termination of this Agreement. If all conditions to the Close of Escrow have been satisfied or waived by the Closing Date and Buyer fails to consummate the purchase of the Interest, in addition to any other rights or remedies that Seller may have, Seller shall be entitled to retain the Cash Deposit and any interest earned thereon pursuant to Section 5 and to terminate this Agreement and, upon such termination, Seller shall be released from all obligations under this Agreement.

 3. **Prorations, Fees and Costs.**

 3.1 **Prorations.** Seller will instruct Additional Escrow Agent to prorate between Buyer and Seller, in cash, to the Close of Escrow: (a) county, city, and special district (if any) real property taxes, special taxes, assessments, and any similar items for the Interest based on the latest information available to Additional Escrow Agent, (b) rental payments, other revenues and expenses, and (c) any other items Seller and Buyer mutually instruct Additional Escrow Agent to prorate prior to the Close of Escrow. All prorations and/or adjustments shall be made on the basis of a thirty (30) day month, unless otherwise specifically instructed by Seller in writing.

 3.2 **Buyer's Fees, Closing Costs, and Loan Fees.** At the Close of Escrow, Buyer will pay: (i) Additional Escrow Agent's escrow fee for the sale of the Interest, (ii) all document drafting, recording, and other closing costs, (iii) if applicable, a loan assumption fee and any other lender-related fees, charges, reimbursements, and related items (collectively, the **"Loan Fees"**), (iv) the cost of the Title Policy, if applicable, and any title endorsements Buyer requests from the Title Policy, (v) to the extent the same are payable pursuant to applicable law, any transfer taxes, or similar charges in the amount Additional Escrow Agent determines to be required by law, and (vi) any costs for the formation of one or more single member limited liability companies to hold title to Buyer's Interest (**"SMLLC"**), as well as any associated legal fees incurred in rendering legal opinions related to the organization of such SMLLC and its authority. Seller and Buyer hereby stipulate that the amount of the Buyer's fees and closing costs, inclusive of the Loan Fees, but specifically excluding transfer taxes (which are incorporated into the Purchase Price), due from Buyer shall be stipulated at $3,000 (the **"Stipulated Closing Costs"**). Notwithstanding the foregoing, to the extent more than one SMLLC must be formed to hold title to Buyer's Interest, Buyer shall pay an additional fee of $1,000 to cover the organizational fees and expenses associated with the formation of such additional entities.

 3.3 **Escrow Cancellation and Title Charges.** If Escrow fails to close due to Buyer's default under this Agreement, Buyer shall pay all escrow cancellation and title charges. If Escrow fails to close for any other reason other than the foregoing, Seller shall pay any escrow cancellation and title charges.

4.    Distribution of Funds and Documents.

4.1    Deposit of Funds. Subject to the terms of Subsection 1.2.1 regarding the Cash Deposit, all cash, if any, received hereunder by Escrow Agent shall, until the Close of Escrow, be kept on deposit with other escrow funds in Escrow Agent's general escrow account(s), in any state or national bank, and may be transferred to any other such general escrow account(s).

4.2    Disbursements. Escrow Agent at the Close of Escrow will hold for personal pickup, or if requested, wire transfer to an account designated by the party receiving such funds, the following: (i) to Seller, or order, the Cash Portion of the Purchase Price, plus any proration or other credits to which Seller will be entitled less any appropriate proration or other charges due Buyer, (ii) to Seller or Lender, the Loan Fees, and (iii) to Buyer, or order, the Cash Deposit and any excess funds previously delivered to Escrow Agent by Buyer. All other disbursements by Escrow Agent shall be made by checks of Escrow Agent in accordance with the Escrow Agreement.

4.3    Recorded Documents. Seller will instruct Additional Escrow Agent to cause the applicable Recorder's office to mail the Deed (and each other document which is herein expressed to be, or by general usage is, recorded) after recordation, to the grantee, beneficiary, or person (i) acquiring rights under said document or (ii) for whose benefit the document was acquired. At the Close of Escrow, Seller will instruct Additional Escrow Agent to deliver to Seller a copy (conformed to show recording date) of the Deed and each document recorded to place title in the condition required by this Agreement.

4.4    Unrecorded Documents. At the Close of Escrow, Seller will instruct Additional Escrow Agent to deliver by United States mail (or to hold for personal pickup, if requested) each nonrecorded document received hereunder by Additional Escrow Agent to the payee or person acquiring rights under said document or for whose benefit said document was acquired. At the Close of Escrow, Seller will deliver by United States mail (or will hold for personal pickup, if requested) each other document received hereunder by Seller or to be delivered hereunder by Seller relating in any way to the purchase of the Interest by Buyer and the related financing of the Property to Buyer to the extent the same was not delivered to the Additional Escrow Agent. Seller shall also provide to Buyer, upon written request and at Buyer's expense, copies of any other agreements, documents, and instruments in Seller's possession or under Seller's control relating to its or its predecessor's ownership or operation of the Property, such as leases, and service contracts.

5.    Default.

5.1    **LIQUIDATED DAMAGES. IF BUYER IS NOT IN DEFAULT, THE CASH DEPOSIT WILL BE FULLY REFUNDED BY THE SELLER UPON WRITTEN NOTICE RECEIVED PRIOR TO THE CLOSE OF BUSINESS ON THE THIRD DAY FOLLOWING THE DATE UPON WHICH THE SELLER NOTIFIES BUYER OF ITS ACCEPTANCE OF THIS AGREEMENT. EXCEPT AS PROVIDED IN SECTIONS 1.2.1, 2.4 AND 7.17 HEREOF, THE CASH DEPOSIT WILL BE NON-REFUNDABLE IF WRITTEN NOTICE IS NOT RECEIVED FROM BUYER WITHIN THE TIME SPECIFIED IN THE PRIOR SENTENCE. IF RETAINED BY THE SELLER, THE CASH DEPOSIT WILL BE RETAINED AND ACCEPTED AS LIQUIDATED DAMAGES AND NOT AS A PENALTY AND SELLER SHALL BE RELEASED FROM ITS OBLIGATION OF SELLING THE INTEREST TO BUYER. IT IS AGREED THAT SAID AMOUNT CONSTITUTES A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER PURSUANT TO APPLICABLE LAW. THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF LIQUIDATED DAMAGES IS FAIR AND REASONABLE CONSIDERING ALL OF THE FACTS AND CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, INCLUDING THE RELATIONSHIP OF SUCH AMOUNT TO THE RANGE OF HARM TO SELLER THAT COULD BE ANTICIPATED, AND THE ANTICIPATION THAT PROOF OF CAUSATION, FORESEEABILITY, AND ACTUAL DAMAGES WOULD BE COSTLY AND/OR IMPRACTICAL. BUYER AND SELLER AGREE THAT IT IS IMPOSSIBLE OR IMPRACTICAL TO PRESENTLY PREDICT WHAT MONETARY DAMAGES SELLER WOULD SUFFER IN SUCH EVENT. BUYER DESIRES TO LIMIT THE MONETARY DAMAGES FOR WHICH BUYER MIGHT BE LIABLE HEREUNDER, AND BUYER AND SELLER DESIRE TO AVOID THE COSTS AND DELAYS THEY WOULD INCUR IF A LAWSUIT WERE COMMENCED TO COLLECT**

4

DAMAGES AND THEREFORE AGREE THAT SUCH LIQUIDATED DAMAGES SHALL CONSTITUTE SELLER'S SOLE AND EXCLUSIVE REMEDY. BY INITIALING THIS PROVISION BELOW, THE PARTIES SPECIFICALLY CONFIRM THE ACCURACY OF SUCH FACTS, THE FACT THAT THEY POSSESS APPROXIMATELY EQUAL BARGAINING STRENGTH AND SOPHISTICATION AND THE FACT THAT EACH OF THEM WAS REPRESENTED BY COUNSEL WHEN ENTERING INTO THIS AGREEMENT, WHICH COUNSEL EXPLAINED THE CONSEQUENCES OF THIS SUBSECTION 5.1 TO THEM AT THE TIME THIS AGREEMENT WAS MADE. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO LIMIT ANY OBLIGATIONS OF BUYER (EXCEPT A DEFAULT CAUSING ESCROW TO FAIL TO CLOSE) THAT SURVIVE THE CLOSE OF ESCROW OR EARLY TERMINATION OF THIS AGREEMENT AND SELLER SHALL HAVE THE RIGHT TO PURSUE ANY CAUSE OF ACTION IT MAY HAVE AGAINST BUYER FOR BUYER'S FAILURE TO PERFORM ANY OTHER COVENANT UNDER THE TRANSACTION DOCUMENTS OR UNDER THIS AGREEMENT AFTER THE CLOSE OF ESCROW OR EARLIER TERMINATION OF THIS AGREEMENT.

BY THE ACT OF AN AUTHORIZED REPRESENTATIVE OF EACH PARTY AFFIXING HIS OR HER INITIALS HEREIN, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE FOREGOING STATEMENTS AND ITS AGREEMENT WITH THEM.

Seller's Initials                                    Buyer's Initials

6.    Representations and Warranties.

     6.1    Seller Representations and Warranties.

        6.1.1    Seller Representations and Warranties. Seller hereby represents and warrants, as of the date of this Agreement and the Close of Escrow, that:

(a)    the execution, delivery, and performance of this Agreement have been duly and validly authorized by Seller;

(b)    this Agreement constitutes a valid and binding obligation of Seller, enforceable in accordance with its terms;

(c)    the execution and delivery by Seller of this Agreement and all such other agreements, and the sale of the Interest hereunder, and the fulfillment of and compliance with the respective terms hereof and thereof by Seller, do not and shall not (1) conflict with or result in a breach of the terms, conditions, or provisions of, (2) constitute a material default under, (3) result in the creation of any lien or encumbrance upon Seller's assets pursuant to, (4) give any third party the right to modify, terminate, or accelerate any obligation under, (5) result in a violation of, or (6) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with any court or administrative or governmental body or agency pursuant to, the organizational documents of Seller, or any law, statute, rule or regulation, order, judgment or decree to which Seller is subject, or any material agreement or instrument to which Seller is subject;

(d)    there are no actions, suits, proceedings, orders, investigations, or claims pending or, to the best of Seller's knowledge, threatened against or, to Seller's knowledge, affecting Seller, or pending or threatened by Seller against any third party, at law or in equity, or before or by any governmental department, commission, board, bureau, agency, or instrumentality (including, without limitation, any actions, suit, proceedings, or investigations with respect to the transactions contemplated by this Agreement); nor have there been any such actions, suits, proceedings, orders, investigations or claims pending against or affecting Seller during the past three years;

(e)    Seller is not subject to any judgment, order, or decree of any court or governmental body, agency, or official of any country or political subdivision of any country, including, but not limited to, federal, state, county, and local governments, administrative agencies, and courts (a "**Governmental**

5

**Authority'),** which could have any change or effect (or aggregation of changes and effects) that is or could reasonably be expected to be materially adverse to the business, assets, condition (financial or otherwise), or operations of Seller;

(f)  no permit, consent, approval, or authorization of, or declaration to or filing with, any governmental authority or any other person or entity is required in connection with the execution, delivery, and performance by Seller of this Agreement or the other agreements contemplated hereby, or the consummation by Seller of any other transactions contemplated hereby or thereby, except those that have already been obtained or made;

(g)  to the best of Seller's knowledge, there are no current, outstanding breaches of any representations, warranties, or covenants made to Seller by the Prior Owner pursuant to the Acquisition Agreement between Seller and Prior Owner;

(h)  all documents, instruments, and other materials provided to Buyer, by Seller, in conjunction with this transaction, including, but not limited to the Memorandum, are true and correct in all material respects, and do not contain any material misstatement of a material fact or fail to state any material fact required to be stated therein or necessary to make any statements contained therein, in light of the circumstances in which they are made, not misleading;

(i)  assuming the representations by Buyer made in this Agreement and in the Purchaser Questionnaire related hereto are true and correct in all material respects, (1) the offer and sale of the Interest pursuant to this Agreement will be exempt from the registration requirements of the Securities Act of 1933, as amended, and (2) neither Seller nor any person or entity acting on Seller's behalf has, in conjunction with the offering of the Interest, engaged in (i) any form of general solicitation or advertising (as those terms are used within the meaning of Rule 502(c) under the Securities Act of 1933, as amended), (ii) any action involving a public offering within the meaning of Section 4(2) of the Securities Act of 1933, as amended, or (iii) any action that would require the registration under the Securities Act of 1933, as amended, of the offering or sale of the Interest pursuant to this Agreement; and

(j)  Seller has not made, and will not make prior to Close of Escrow, directly or indirectly, any offer or sale of the Interests or of other securities of the same or similar class as the Interest if, as a result thereof, the offer and sale contemplated hereunder of the Interest could fail to be entitled to exemption from the registration requirements of the Securities Act of 1933, as amended.

For purposes of the foregoing, the terms "offer" and "sale" have the meanings specified in Section 2(3) of the Securities Act of 1933, as amended.  Further, as used herein, the term "knowledge" shall mean the actual knowledge of such person or party, following due and reasonable inquiry.

6.1.2  NO TAX REPRESENTATIONS.  BUYER REPRESENTS AND WARRANTS THAT EXCEPT AS EXPRESSLY PROVIDED IN THE TAX OPINION PROVIDED BY SELLER'S SPECIAL TAX COUNSEL, WHICH OPINION IS QUALIFIED AND BASED ON NUMEROUS ASSUMPTIONS THAT MAY NOT BE APPLICABLE TO BUYER, IT IS NOT RELYING UPON ANY ADVICE OR ANY INFORMATION OR MATERIAL FURNISHED BY THE SPONSORS, SELLER OR THEIR RESPECTIVE REPRESENTATIVES, WHETHER ORAL OR WRITTEN, EXPRESSED OR IMPLIED, OF ANY NATURE WHATSOEVER, REGARDING ANY TAX MATTERS, INCLUDING WITHOUT LIMITATION, A DECISION BY BUYER TO EFFECT A TAX-DEFERRED EXCHANGE UNDER INTERNAL REVENUE CODE SECTION 1031, AS AMENDED.   BUYER FURTHER REPRESENTS AND WARRANTS THAT IT HAS INDEPENDENTLY OBTAINED ADVICE FROM ITS OWN INDEPENDENT LEGAL COUNSEL AND/OR TAX ACCOUNTANT REGARDING ANY SUCH TAX-DEFERRED EXCHANGE, INCLUDING, WITHOUT LIMITATION, WHETHER THE ACQUISITION OF THE INTEREST PURSUANT TO THIS AGREEMENT MAY QUALIFY AS PART OF A TAX-DEFERRED EXCHANGE, AND BUYER IS RELYING SOLELY ON SUCH ADVICE.

6.2  Commissions.  The parties mutually warrant and covenant that, other than commissions and fees described in the Memorandum or this Agreement, no brokerage commissions, finder's fees, or similar

commissions or fees shall be due or payable by the Buyer on account of this transaction. Each party shall indemnify, protect, defend (with legal counsel acceptable to the other), and hold the other harmless from the claims for such commission or finder's fees or similar commissions or fees arising out of the actions of the indemnifying party, including, without limitation, attorneys' fees and costs, incurred in connection therewith or to enforce this indemnity, which indemnities shall survive the Close of Escrow.

6.3     Additional Buyer Representations and Warranties. Buyer hereby represents and warrants to Seller that the following are true and correct on the date of this Agreement and shall be true and correct as of the Closing Date.

6.3.1     Buyer acknowledges that it has received, read, and fully understands the Memorandum. Buyer acknowledges that it is basing its decision to invest in the Interest on the Memorandum and Buyer has relied only on the information contained in said materials and has not relied upon any representations made by any other person. Buyer recognizes that an investment in the Interest involves substantial risk and Buyer is fully cognizant of and understands all of the risk factors related to the purchase of the Interest, including, but not limited to, those risks set forth in the section of the Memorandum entitled "RISK FACTORS."

6.3.2     Buyer's overall commitment to investments that are not readily marketable is not disproportionate to its individual net worth, and its investment in the Interest will not cause such overall commitment to become excessive. Buyer has adequate means of providing for its financial requirements, both current and anticipated, and has no need for liquidity in this investment. Buyer can bear and is willing to accept the economic risk of losing its entire investment in the Interest. Buyer has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment in the Interests.

6.3.3     Buyer acknowledges that the offer and sale of the Interest has not been accompanied by the publication of any public advertisement or by any general solicitation.

6.3.4     All information that Buyer has provided to Seller concerning its suitability to invest in the Interest is complete, accurate, and correct as of the date of its signature on the last page of this Agreement. Buyer hereby agrees to notify Seller immediately of any material change in any such information occurring prior to the Closing Date, including any information about changes concerning its net worth and financial position.

6.3.5     Buyer has had the opportunity to ask questions of, and receive answers from, Seller, Sponsors, Manager, and their owners, officers, members, managers, employees, and affiliates, concerning the Property and the terms and conditions of the offering of the Interests and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum. Buyer has been provided with all materials and information requested by either Buyer or others representing Buyer, including any information requested to verify any information furnished Buyer.

6.3.6     Buyer is purchasing the Interest for Buyer's own account and for investment purposes only and has no present intention, agreement, or arrangement for the distribution, transfer, assignment, resale, or subdivision of the Interest. Buyer understands that, due to the restrictions referred to in Subsection 6.5.7, and the lack of any market existing or to exist for the Interest, Buyer's investment in the Interest will be highly illiquid and may have to be held indefinitely.

6.3.7     Buyer understands that legends may be placed in or on the Co-Ownership Agreement with respect to restrictions on distribution, transfer, resale, assignment, or subdivision of the Interest imposed by applicable federal and state securities laws. Buyer is fully aware that the Interest has not been registered with the Securities and Exchange Commission in reliance on the exemptions specified in Regulation D issued by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, which reliance is based in part upon Buyer's representations set forth herein. Buyer understands that the Interest has not been registered under applicable state securities laws and are being offered and sold pursuant to the exemptions specified in said laws, and unless they are registered, they may not be re-offered for sale or resold except in a transaction or as a security exempt under those laws. Buyer further understands that the specific approval of such resales by a state securities administrator or official may be required in some states.

7

6.3.8    BUYER UNDERSTANDS THAT SELLER HAS NOT OBTAINED A RULING FROM THE INTERNAL REVENUE SERVICE THAT THE INTEREST WILL BE TREATED AS AN INTEREST IN REAL ESTATE AS OPPOSED TO AN INTEREST IN A BUSINESS ENTITY. BUYER UNDERSTANDS THAT THE TAX CONSEQUENCES OF AN INVESTMENT IN THE INTEREST, ESPECIALLY THE TREATMENT OF THE TRANSACTION UNDER SECTION 1031 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("IRC"), AND THE RELATED "1031 EXCHANGE" RULES AND REGULATIONS, ARE COMPLEX AND VARY WITH THE FACTS AND CIRCUMSTANCES OF EACH INDIVIDUAL PURCHASER. BUYER SPECIFICALLY REPRESENTS AND WARRANTS THAT BUYER (I) HAS CONSULTED ITS OWN TAX ADVISOR REGARDING AN INVESTMENT IN THE INTEREST AND THE TREATMENT OF THE TRANSACTION UNDER IRC SECTION 1031; (II) EXCEPT AS EXPRESSLY PROVIDED IN THE TAX OPINION FROM SELLER'S SPECIAL TAX COUNSEL, WHICH IS QUALIFIED AND BASED ON NUMEROUS ASSUMPTIONS AND QUALIFICATIONS THAT MAY NOT BE APPLICABLE TO THE BUYER, IS NOT RELYING ON SELLER OR ANY OF ITS AFFILIATES OR ANY BROKER-DEALER THROUGH WHOM THE INTEREST IS PURCHASED, FOR ANY TAX ADVICE REGARDING THE TREATMENT OF BUYER'S TRANSACTION UNDER IRC SECTION 1031; AND (III) IS NOT RELYING ON ANY STATEMENTS MADE IN THE MEMORANDUM REGARDING THE TREATMENT OF ITS PURCHASE OF THE INTEREST UNDER IRC SECTION 1031.

6.3.9    Buyer understands that none of Seller, the Sponsors, Manager, or their owners, officers, members, managers, employees or affiliates, legal counsel, or advisors represent Buyer in any way in connection with the purchase of the Interest and the entering into any of the related agreements associated with the purchase, including, but not limited to the Co-Ownership Agreement. Buyer also understands that legal counsel to Seller, Sponsors, Manager, and their affiliates does not represent, and shall not be deemed under the applicable codes of professional responsibility to have represented or to be representing, Buyer.

6.3.10    THE INTEREST OFFERED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTEREST IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.    THE INTEREST HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

6.3.11    Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Sponsors, Manager, and each of their owners, officers, members, managers, affiliates, and advisors of and from any and all damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Buyer's failure to fulfill all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, covenants, or agreements contained herein or in any other documents Buyer has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) incurred by Seller, Sponsors, Manager, or any of their owners, officers, members, managers, affiliates, or advisors defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents Buyer has furnished to any of the foregoing in connection with this transaction.

6.3.12    Within five (5) days after receipt of a written request from Seller, Buyer agrees to provide such information and to execute and deliver such documents as may be reasonably necessary to comply with any and all laws and regulations to which Seller or Buyer is subject.

6.4    The representations and warranties of Buyer and Seller set forth herein above shall survive the Close of Escrow or termination of this Agreement.

8

7.   <u>General Provisions</u>.

      7.1   <u>Interpretation</u>. The use herein of (i) the neuter gender includes the masculine and the feminine, (ii) the singular number includes the plural, whenever the context so requires and (iii) the words "I" and "me" include "we" and "us" if Buyer is more than one person. Captions in this Agreement are inserted for convenience of reference only and do not define, describe, or limit the scope or the intent of this Agreement or any of the terms hereof. All exhibits referred to herein and attached hereto are incorporated by reference. This Agreement, together with the other Transaction Documents, contain the entire agreement between the parties relating to the transactions contemplated hereby, and all prior or contemporaneous agreements, understandings, representations and statements, whether oral or written, are merged herein.

      7.2   <u>Modification</u>. No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement thereof is or may be sought.

      7.3   <u>Cooperation</u>. Buyer and Seller acknowledge that it may be necessary to execute documents other than those specifically referred to herein to complete the acquisition of the Interest as provided herein. Buyer and Seller agree to cooperate with each other in good faith by executing such other documents or taking such other action as may be reasonably necessary to complete this transaction in accordance with the parties' intent evidenced in this Agreement.

      7.4   <u>Assignment</u>. Neither party may assign its rights under this Agreement, except, in the case of Buyer, to (a) Accommodator as required by the IRC Section 1031, and/or (b) to a limited liability company in which Buyer is the sole member, without first obtaining the other party's prior written consent, which consent may be withheld in such party's sole and absolute discretion. No such assignment shall operate to release the assignor from the obligation to perform all of its obligations hereunder.

      7.5   <u>Notices</u>. Unless otherwise specifically provided herein, all notices, demands, or other communications given hereunder shall be in writing and shall be addressed as follows:

                If to Seller, to:    USA Sunset Media, LLC
                                  c/o U.S. Commercial, LLC
                                  111 Corporate Drive, Suite 210
                                  Ladera Ranch, California 92694
                                  (877) 872-1031 (phone)
                                  (949) 429-6606 (facsimile)
                                  Attention: H. Michael Schwartz, President

If to Buyer, to Buyer's address as provided to Seller. Either party may change such address by written notice to Escrow Agent and the other party. Unless otherwise specifically provided for herein, all notices, payments, demands or other communications given hereunder shall be deemed to have been duly given and received: (i) upon personal delivery, or (ii) as of the third business day after mailing by United States registered or certified mail, return receipt requested, postage prepaid, addressed as set forth above, or (iii) the immediately succeeding Business Day after deposit with Federal Express or other similar overnight delivery system that maintains tracking and evidence of delivery.

      7.6   <u>Periods of Time</u>. All time periods referred to in this Agreement include all Saturdays, Sundays, and state or United States holidays, unless Business Days are specified, provided that if the date or last date to perform any act or give any notice with respect to this Agreement falls on a Saturday, Sunday, or state or national holiday, such act or notice may be timely performed or given on the next succeeding Business Day.

      7.7   <u>Counterparts</u>. This Agreement may be executed in counterparts, all of which when taken together shall be deemed fully executed originals.

9

7.8     Attorneys' Fees.  If either party commences litigation for the judicial interpretation, enforcement, termination, cancellation, or rescission hereof, or for damages (including liquidated damages) for the breach hereof against the other party, then, in addition to any or all other relief awarded in such litigation, the substantially prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees and court and other costs incurred.

7.9     Joint and Several Liability.  If any party consists of more than one person or entity, the liability of each such person or entity signing this Agreement shall be joint and several.

7.10     Choice of Law.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Delaware, without regard to its conflicts of laws principles.

7.11     Time.  Time is of the essence with respect to all dates set forth in this Agreement.

7.12     Third-Party Beneficiaries.  Buyer and Seller do not intend to benefit any party (including any other Co-Owners) that is not a party to this Agreement and no such party shall be deemed to be a third party beneficiary of this Agreement or any provision hereof.

7.13     Severability.  If any term, covenant, condition, provision, or agreement herein contained is held to be invalid, void or otherwise unenforceable by any court of competent jurisdiction, such fact shall in no way affect the validity or enforceability of the other portions of this Agreement.

7.14     Election to Effect an Internal Revenue Code Section 1031 Exchange.  In the event Buyer so elects, Seller agrees to cooperate with Buyer, at no cost or expense to Seller, in effecting a tax-deferred exchange under IRC Section 1031. Buyer shall have the right to elect a tax-deferred exchange at any time prior to the Closing Date. If Buyer elects to effect a tax-deferred exchange, Seller agrees to execute revised or additional escrow instructions, documents, agreements, or instruments to effect the exchange, provided that Seller shall incur no additional costs, expenses, fees, or liabilities, nor shall the closing be delayed as a result of the exchange. Buyer may assign this Agreement to an accommodator in order to effect such exchange and, thereafter, such assignee will perform Buyer's obligations under this Agreement.

7.15     Binding Agreement.  Subject to any limitation on assignment set forth herein, all terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, successors and assigns.

7.16     ARBITRATION OF DISPUTES.

7.16.1     BINDING ARBITRATION.  ANY DISPUTE OR CONTROVERSY ARISING OUT OF, OR RELATING TO, THIS AGREEMENT SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION BROUGHT IN CHICAGO, ILLINOIS, UNDER THE AUSPICES AND RULES OF JAMS, INC., AND THE PARTIES HERETO SUBMIT TO THE IN PERSONAM JURISDICTION OF SUCH TRIBUNAL AND WAIVE ANY OBJECTION THAT SUCH FORUM IS INCONVENIENT OR OTHERWISE IMPROPER. THE SUBSTANTIALLY PREVAILING PARTY OR PARTIES IN ANY SUCH ARBITRATION (AS DETERMINED BY THE ARBITRATOR) SHALL RECEIVE FROM THE OTHER PARTY OR PARTIES TO THE ARBITRATION SUCH PREVAILING PARTY'S (OR PARTIES') FEES AND COSTS OF ARBITRATION, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS, IN ADDITION TO ANY OTHER RELIEF TO WHICH SUCH PREVAILING PARTY OR PARTIES MAY BE ENTITLED.

7.16.2   WAIVER OF LEGAL RIGHTS.  BY INITIALING IN THE SPACE BELOW, THE PARTIES ACKNOWLEDGE AND AGREE TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THIS ARTICLE DECIDED BY NEUTRAL ARBITRATION AS PROVIDED UNDER APPLICABLE LAW AND THAT THEY ARE KNOWINGLY WAIVING ANY RIGHTS THEY MAY POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR BY JURY TRIAL.  THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT THEY ARE WAIVING THEIR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL EXCEPT TO THE EXTENT SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THIS ARTICLE. IF EITHER PARTY REFUSES TO SUBMIT TO ARBITRATION AFTER EXECUTION OF THIS AGREEMENT AND INITIALING BELOW, SUCH PARTY MAY BE COMPELLED TO ARBITRATE UNDER APPLICABLE LAW.   EACH PARTY'S AGREEMENT TO THIS ARTICLE IS VOLUNTARY.  THE PARTIES HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THIS ARTICLE TO BINDING ARBITRATION.

_____          _____
Seller's Initials                          Buyer's Initials

7.17   ACCEPTANCE OR REJECTION OF BUYER'S OFFER.  THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER OF ANY KIND BY SELLER AND SHALL NOT BIND SELLER UNLESS DULY EXECUTED AND DELIVERED BY SELLER.  TO SUBMIT AN OFFER, BUYER SHALL DELIVER TO ESCROW AGENT (i) ONE COMPLETED AND EXECUTED ORIGINAL OF THIS AGREEMENT (OR AS MANY COMPLETED AND EXECUTED ORIGINALS AS THE ESCROW AGENT MAY REQUEST) AND (ii) CASH IN THE AMOUNT OF THE CASH DEPOSIT AND (3) THE PURCHASER QUESTIONNAIRE. SELLER SHALL HAVE TEN (10) DAYS TO EITHER ACCEPT OR REJECT BUYER'S OFFER.  IF SELLER DOES NOT ACCEPT BUYER'S OFFER WITHIN SUCH TEN (10) DAY PERIOD, THE OFFER SHALL BE DEEMED REJECTED. IN THE EVENT THE OFFER IS REJECTED, THE CASH DEPOSIT SHALL BE RETURNED TO BUYER WITHOUT INTEREST AND THIS AGREEMENT SHALL NOT BECOME EFFECTIVE.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, this Agreement has been executed as of the Effective Date.

**SELLER:**                                                                    **BUYER:**

USA Sunset Media, LLC,
a Delaware limited liability company

By: CB Richard Ellis Investors/U.S. Advisor, LLC                               By: _____
    a Delaware limited liability company
Its: Manager,                                                                  Title: _____TRUSTEE_____

By: _____
    Kevin S. Fitzgerald
    Its: Board Director                                              Dated: _____1-6-06_____

Dated: _____01/10/06_____

By: _____

Title: _____TRUSTEE_____

Dated: _____1-6-06_____

**PARTIES MUST ALSO INITIAL SUBSECTIONS 5.1 AND 7.16.2.**

12

## EXHIBIT "A"

**[PROPERTY LEGAL DESCRIPTION TO BE ATTACHED]**

## EXHIBIT "B"
## DEFINED TERMS

This list of Defined Terms is attached to and forms a part of the Purchase Agreement and Escrow Instruction between Buyer and Seller.

"Acquisition Agreement" shall have the meaning set forth in Subsection 1.1.2.

"Additional Escrow Agent" means Chicago Title Company or other escrow agent qualified selected by Seller to assist with the Close of Escrow.

"Business Day" means any day other than a Saturday or Sunday or legal holiday in the State of California.

"Cash" means (i) currency of the United States of America, (ii) cashier's check(s) currently dated and payable to Escrow Agent or Seller, as required under this Agreement, drawn and paid through a duly organized and operating bank or savings and loan institution, tendered to Escrow Agent or Seller, as required under this Agreement at least two (2) Business Days before funds are otherwise required to be delivered under this Agreement, or (iii) an amount credited by wire transfer to Escrow Agent's or Seller's bank account, as required under this Agreement.

"Close of Escrow" means the date and time when the Deed is recorded in the official records of the county in which the Property is located or in such other appropriate office

"Co-Owners" means all persons holding an undivided tenant in common interest in the Property from time to time, including Seller (to the extent it retains an interest in the Property) and Buyer.

"Co-Ownership Agreement" shall mean that certain agreement in the form attached to the Memorandum executed or to be executed by the other Co-Owners and to be executed or assumed by Buyer as of the Close of Escrow, as from time to time amended in accordance with its terms.

"Deed of Trust" means that certain deed of trust document in favor of Lender and its successors and assigns, to be recorded as a lien against the Property as security for the Loan.

"Escrow" means the escrow created by this Agreement.

"Escrow Agent" means Wells Fargo Bank, N.A. or other qualified escrow agent selected by Seller.

"Escrow Agreement" means the escrow agreement between the Company and Escrow Agent pursuant to which Escrow Agent will hold and disburse the proceeds from subscriptions for the purchase of Interests.

"Interest" shall have the meaning set forth in Subsection 1.1.

"Lender" means PNC Bank, N.A., and their successors and assigns.

"Loan" means the mortgage loan from the Lender, assumed as of the Close of Escrow by the Co-Owners in the original principal amount of $55,000,000.00.

"Loan Assumption Documents" means the loan assumption documents required by Lender, as relevant, in connection with Buyer's assumption of the Loan, or purchasing the Interest subject to the Loan.

"Loan Documents" means the Promissory Notes, Deed of Trust, UCC Financing Statement and other documents evidencing or securing the Loan.

"Manager" means USA Sunset Media Management, LLC, a Delaware limited liability company.

"Management Agreement" means the Management Agreement in substantially the form attached to the Memorandum entered into or to be entered into or assumed between the Co-Owners and the Manager and to be executed or assumed by Buyer as of the Close of Escrow, as from time to time amended.

"Memorandum" means the Confidential Private Placement Memorandum for the sale of Co-Owners Interests in the Property dated October 2005, as the same may from time to time be supplemented.

"Note" means that certain promissory note issued to Lender and to be assumed by the Co-Owners in the amount of $55,000,000.00 in connection with the Loan.

"Opening of Escrow" means the date Escrow Agent signs the "Consent of Escrow Agent" attached hereto following Seller's acceptance of Buyer's offer to purchase.

"Prior Owner" shall have the meaning set forth in Subsection 1.1.2.

"Property" shall have the meaning set forth in Recital A.

"Property Rights" shall have the meaning set forth in Recital B.

"Purchase Price" shall have the meaning set forth in Subsection 1.1.1.

"Purchaser Questionnaire" means the Purchaser's Questionnaire executed and delivered to the Company by Buyer.

"Seller" shall mean USA Sunset Media, LLC, a Delaware limited liability company.

"Sponsors" means U.S. Advisor, LLC, a Virginia limited liability company, CB Richard Ellis Investors, L.L.C., a Delaware limited liability company, CB Richard Ellis Investors/U.S. Advisor, LLC, a Delaware limited liability company, U.S. Commercial, LLC, a Virginia limited liability company and their successors and assigns.

"Stipulated Closing Costs" shall have the meaning set forth in Subsection 3.2.

"Transaction Documents" means this Agreement, the Purchaser Questionnaire, the Loan Documents, and the Loan Assumption Documents (as relevant), the Management Agreement, and the Co-Ownership Agreement.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit B

# CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

THIS CO-OWNERSHIP AGREEMENT (this "**Agreement**"), dated as of _____, 2006, is made among the several signatories to this Agreement (referred to herein collectively as the "**Co-Owners**" and separately as a "**Co-Owner**") and USA Sunset Media Management, LLC, a Delaware limited liability company (the "**Manager**").

## RECITALS

A.     USA Sunset Media, LLC, a Delaware limited liability company (the "**Company**"), is the owner of the real property and improvements commonly known as Sunset Media Tower, an approximately 320,905-square-foot Class-A office and retail building located at 6255 Sunset Boulevard, Hollywood, California (the "**Property**").

B.     The undersigned Co-Owners have purchased undivided tenant in common interests in the Property (each an "Interest" and collectively the "Interests") from the Company.

C.     The Property is encumbered by a loan from PNC Bank, National Association (including its successors and assigns, the "**Lender**"), in the aggregate original principal amount of $55,000,000.00 (the "**Loan**").

D.     The Loan is evidenced and secured by a Promissory Note in the original principal amount of $55,000,000.00 payable to the Lender (referred to herein as the "**Note**"), a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing (the "**Mortgage**"), an Environmental Indemnity Agreement, an Assignment of Leases and Rents, a Borrower's Certificate, various Non-Recourse Indemnification Agreements, UCC Financing Statements, a Capital Improvement Escrow Agreement, a Tenant Improvement and Leasing Commission Agreement, a Security Agreement and Lockbox Agreement, and certain other documents evidencing or securing the Loan (collectively, the "**Loan Documents**").

E.     The Co-Owners desire to enter into this Agreement to set forth the terms of their ownership of the Property.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Co-Owners do hereby agree as follows:

## ARTICLE 1
## CO-OWNERS' OWNERSHIP/MANAGEMENT OF THE PROPERTY

1.1     <u>Co-Tenancy Created</u>.  The Co-Owners shall own the Property as tenants-in-common pursuant to state law and in accordance with the terms and conditions set forth in this Agreement.  As used in this Agreement, a Co-Owner's "**Ownership Interest**" shall mean such Co-Owner's undivided percentage ownership interest in the Property. Each Co-Owner's Ownership Interest is set forth on the attached Exhibit A of this Agreement.

1.2     **Purposes**.  The purposes of the Co-Owners with respect to the Property are:  (i) to acquire, manage, lease, mortgage and dispose of the Property; and (ii) to take such other actions as the Co-Owners deem necessary or advisable to carry out the foregoing.  The Co-Owners shall hold the Property for investment purposes only and not for the active conduct of a trade or business, and the Co-Owners shall only engage in activities that are customary services in connection with the maintenance and repair of the Property.  Specifically, neither the Co-Owners nor their agents shall provide services: (a) that are not "customary services" within the meaning of Revenue Ruling 75-374, 1975-2 C.B. 261; (b) the payment for which would not qualify as "rent" as defined by Section 512(b)(3)(A) of the Internal Revenue Code of 1986, as amended (the "**Code**") and the Regulations thereunder; or (c) the payment for which would not qualify as "rents from real property" as defined by Code Sections 856(c)(2)(C) and 856(c)(3)(A) and the Regulations thereunder.

1.3     Disclaimer of Entity Status.

(a)     Each Co-Owner expressly disclaims any intention to create a partnership, corporation, or other business entity with the other Co-Owners, or between the Co-Owners and the Manager (as defined below) or any other person. Nothing in this Agreement shall make any Co-Owner a partner or agent of another Co-Owner or any other person. The Co-Owners shall not conduct business under a common name or hold themselves out as partners, shareholders, or members of a business entity.

(b)     The Co-Owners hereby agree that their joint ownership of the Property as tenants-in-common shall be excluded from Subchapter K of the Code and the Co-Owners will report on their federal, state and local income tax returns all items of income, deduction, credits and expense consistent therewith which result from their Interests as provided in Treasury Regulation Section 1.761-2(b). No Co-Owner shall notify the Commissioner of Internal Revenue that such Co-Owner desires that Subchapter K of the Code apply to the Co-Owners and each Co-Owner hereby agrees to indemnify, protect, defend and hold the other Co-Owners free and harmless from all costs, liabilities, tax consequences and expenses, including, without limitation, attorneys' fees, which may result from any Co-Owner so notifying the Commissioner in violation of this Agreement or otherwise taking a contrary position on any tax return.

(c)     No Co-Owner shall be liable in its capacity as a Co-Owner for the debts or obligations incurred by any other Co-Owner with respect to the Property or otherwise, and no Co-Owner shall have any authority, other than as provided herein, to act on behalf of any other Co-Owner or to impose any obligation with respect to the Property.

1.4     Limitation on Number of Co-Owners.     Notwithstanding anything to the contrary in this Agreement, at no time shall the number of Co-Owners exceed the limit set forth in Revenue Procedure 2002-22, 2002-1 C.B. 733, as such limit may be modified from time to time.

1.5     Management Agreement; Duties of Manager.

(a)     Each Co-Owner shall execute that certain management agreement, or an assignment and assumption of the management agreement, with the Manager, dated evenly herewith (the "**Management Agreement**") Pursuant to the Management Agreement, the Co-Owners have appointed the Manager as manager of the Property, and the Manager shall be the sole and exclusive manager of the Property and shall act on behalf of the Co-Owners with respect to the management, operation, maintenance and leasing of the Property, subject to the right of each Co-Owner to terminate the Management Agreement pursuant to the Management Agreement and this Agreement.

(b)     In addition the Manager's duties in the Management Agreement, the Manager shall also have the duties specified in this Agreement. If the Manager is replaced by the Co-Owners, the substitute Manager selected by the Co-Owners shall have the duties of Manager specified in this Agreement. The duties of a Manager set forth herein shall be undertaken by the Manager without any prior specific written instructions from the Co-Owners.

(c)     In addition to those duties of the Manager otherwise provided herein, the duties of the Manager pursuant to this Agreement shall include:

(i)     Providing notices to and receiving notices from the Lender on behalf of the Co-Owners with respect to the Loan. Notices from the Lender sent to the Manager on behalf of the Co-Owners constitute notice to all Co-Owners and shall be binding on all Co-Owners.

(ii)     Upon the written instruction of the Co-Owners, providing notices to and effectuating the decisions of the Co-Owners made pursuant to Article 6 of this Agreement, and giving notice, direction or exercising a right, remedy or power in respect of the Property pursuant to this Agreement, the Management Agreement or the Loan Documents. Each Co-Owner agrees that Lender shall be entitled to accept and

2

rely upon notices or elections under the Loan Documents that are sent by the Manager on behalf of the Co-Owners, and such notices and elections shall be binding on all Co-Owners.

## ARTICLE 2
## USE OF THE PROPERTY

2.1    Use of Property. Subject to Section 1.2 and any leases to which the Property is subject, the Co-Owners shall be entitled to share in the use of the entire Property in accordance with their respective Ownership Interests. No Co-Owner may exclude any other Co-Owner from all or any portion of the Property. However, the Co-Owners' use of the Property shall at all times comply with the terms of the Management Agreement and the Loan Documents.

2.2    Loan Responsibilities. The Co-Owners shall cause the Property to be maintained and shall otherwise conduct themselves in relation to the Property in accordance with the Management Agreement and the Loan Documents. Without limitation of the foregoing, insofar as the Loan Documents require a Co-Owner to be a so-called special purpose bankruptcy remote entity (an "SPE"), each Co-Owner (and each owner of such Co-Owner) covenants and agrees to at all times maintain such Co-Owner's status as such in accordance with the SPE requirements of the Loan Documents and their own operating agreements (each such operating agreement an "SMLLC Agreement"). In addition, the membership interest in any Co-Owner may not be transferred or encumbered except in compliance with the Loan Documents. In addition, all rights, remedies, and indemnities of each Co-Owner against any other Co-Owner or in the Interest of any Co-Owner pursuant to this Agreement, at law, in equity, or otherwise, are hereby made expressly subordinate and inferior to the Loan and Lender's rights under the Loan Documents. Furthermore, notwithstanding anything to the contrary herein, each Co-Owner agrees that it will not exercise any rights it may have against any other Co-Owner or in the Interest of any Co-Owner, whether such rights accrue pursuant to this Agreement, at law, in equity, or otherwise, for so long as any obligations of the Co-Owners remain outstanding under the Loan. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be bound by the terms, conditions and obligations of this Section 2.2.

2.3    Records; Returns. Each Co-Owner is separately responsible to determine its income, gain, loss, deduction and credit, if any, with respect to its undivided interest in the Property. No partnership, corporate, or other entity-like records or returns shall be maintained or filed by or on behalf of the Co-Owners.

## ARTICLE 3
## INCOME AND PROCEEDS FROM THE PROPERTY

3.1    Income from Property Operations. Subject to Article 4 below, all income, revenue and other cash flow derived from the operation of the Property, net of such amounts as may be reasonably determined by the Manager to be retained for reasonable reserves for operations, repairs or improvements in accordance with the Management Agreement, shall be disbursed by the Manager to the Co-Owners, pro rata, in accordance with their respective Ownership Interests, on a quarterly basis.

3.2    Disbursement of Proceeds on Disposition of the Property. Subject to Article 4 below, net proceeds derived from the sale, exchange, or other joint disposition of, or from the financing or refinancing of all or any part of the Property, after satisfaction of any debts, liabilities or expenses of the Property, shall be disbursed to the Co-Owners, pro rata, in accordance with their respective Ownership Interests.

## ARTICLE 4
## PAYMENT OF PROPERTY EXPENSES; RIGHT OF CONTRIBUTION

4.1    Obligation to Pay. Except as otherwise expressly provided in this Agreement, the Co-Owners shall apportion all debts, liabilities and expenses that they incur in connection with the Property ("Property Expenses") in proportion to their respective Ownership Interests. Without limitation of the foregoing, Property Expenses shall include all debt service with respect to the Property. For the avoidance of doubt, (a) nothing herein

3

shall be deemed to affect the joint and several liability of the Co-Owners under the Loan Documents; and (b) all payments required to be made pursuant to the terms of the Loan Documents shall have priority over all other payments provided for hereunder, including, but not limited to, disbursements to Co-Owners pursuant to Article 3 and payments in respect of any "Co-Owner Loan" (as defined in Section 4.5(a) below).

   4.2 <u>Time for Payment</u>. The Manager shall be responsible for collecting and disbursing each Co-Owner's funds (including each Co-Owner's share of income from the Property) and timely paying all Property Expenses. Whenever the Manager determines that such Property Expenses must be paid in an amount which exceeds the Co-Owner's share of income from the Property then held by the Manager, the Manager shall give written notice to the Co-Owners setting forth (a) the total amount required to pay the Property Expenses and (b) such Co-Owner's proportionate share thereof. The Co-Owners shall have three business days from the date such notice is received to deliver to the Manager, by wire transfer, certified or bank cashier's check or other mutually acceptable means, their share of the required funds.

   4.3 <u>Delinquencies</u>. If a Co-Owner does not timely pay its share of Property Expenses when due in accordance with Section 4.2 hereof, the Manager shall send the delinquent Co-Owner written notice of delinquency, giving such delinquent Co-Owner an additional two business days from the date such notice is received to pay in full its proportionate share of the Property Expenses. If the delinquent Co-Owner does not timely pay the full amount of its proportionate share of the Property Expenses, together with any and all late fees, additional interest and other charges resulting from the delinquency, the delinquent Co-Owner shall thereupon become a "Defaulting Co-Owner."

   4.4 <u>Indemnity</u>. A delinquent Co-Owner or Defaulting Co-Owner shall pay all late fees, additional interest or other charges that the other Co-Owners incur as a result of such Co-Owner's failure to timely pay its share of the Property Expenses, and shall otherwise indemnify the other Co-Owners from any and all loss, cost, liability or expense suffered on account of such Co-Owner's failure.

   4.5 <u>Co-Owner Loans</u>.

     (a) If a delinquent Co-Owner becomes a Defaulting Co-Owner by failing to pay its share of Property Expenses when due (*i.e.*, after the additional notice provided in Section 4.3 hereof and the expiration of the two-business-day period for payment), the Manager shall give written notice of such failure to the other Co-Owners (each a "**Non-Defaulting Co-Owner**") within seven days of the expiration of the two-business-day period described in Section 4.3, which Non-Defaulting Co-Owners may then elect to pay all or any part of the Defaulting Co-Owner's proportionate share of the delinquent Property Expenses (each such paying Co-Owner a "**Lending Co-Owner**"). Such amount shall be treated as a loan by the Lending Co-Owners to the Defaulting Co-Owner (a "**Co-Owner Loan**"). All Co-Owner Loans shall be payable in full within 31 days from the date such loan was made, or earlier upon demand, together with interest at the prime rate of interest as published from time to time in The Wall Street Journal, plus 6%. If the sum of the loans Lending Co-Owners wish to make is more than the delinquent Property Expenses, the Lending Co-Owners shall allocate the aggregate loan amount among them according to their relative Ownership Interests without consideration of the Defaulting Co-Owner's Ownership Interest, or as they might otherwise agree. All Co-Owner Loans shall be with recourse to the Defaulting Co-Owner. In the event that the Defaulting Co-Owner is an entity that is an SPE, Co-Owner Loans shall be with recourse to the owner of the Defaulting Co-Owner. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to such recourse liability.

     (b) Except to the extent prohibited by the Loan Documents, each Co-Owner hereby grants to each other Co-Owner a lien on such Co-Owner's Interest to secure its obligations and those of its owner, if applicable, under this Agreement, including without limitation, such Co-Owner's obligations to pay its share of all expenses the Co-Owners incur in connection with their joint ownership of the Property (the "**Co-Owner Lien**"). Any such Co-Owner Lien if made is expressly subordinate and inferior to the Loan and Lender's rights under the Loan Documents. Furthermore, without the Lender's prior written approval, any holder of a Co-Owner Lien shall not exercise any right to foreclose such Co-Owner Lien against the Defaulting Co-Owner's Interest, as provided in Section 4.5(c)(i).

(c)     If a Co-Owner Loan is not paid when due, the Lending Co-Owners may, without further notice or condition, elect either of the remedies set forth below:

(i)     Demand payment of the entire outstanding principal balance of the Co-Owner Loan, together with all accrued but unpaid interest thereon, and, if not paid, initiate any appropriate legal action against the Defaulting Co-Owner to recover the amounts owed, together with all collection costs, litigation expenses and attorney's fees, including without limitation, an action to foreclose the Co-Owner Lien on the Defaulting Co-Owner's Interest in favor of the Lending Co-Owner(s).

(ii)    Purchase the Interest of the Defaulting Co-Owner for an amount equal to the fair market value of the Interest as determined pursuant to Section 6.6. A Lending Co-Owner desirous of purchasing the Defaulting Co-Owner's Interest shall give written notice of its intent to do so (the "Buy-Out Notice") to the Manager and all Co-Owners. Non-Defaulting Co-Owners who are not Lending Co-Owners may notify the Lending Co-Owners of their desire to participate in the purchase by giving written notice to the Manager and all Co-Owners within 10 days of receipt of the Buy-Out Notice. If more than one Non-Defaulting Co-Owner desires to purchase the Defaulting Co-Owner's Interest, the Interest of the Defaulting Co-Owner shall be allocated first among the Lending Co-Owners according to the relative Co-Owner Loans made by them, and then the remainder (if any) among the other Non-Defaulting Co-Owners in accordance with their Ownership Interests, or as the Lending Co-Owners and other Non-Defaulting Co-Owners might otherwise agree. The purchase price for the Defaulting Co-Owner's Interest shall be paid in cash at closing (as herein defined), reduced by the outstanding balance of any Co-Owner Loan (principal, interest, and costs as described above) held by the purchaser. If the amount of the Co-Owner Loan is greater than the purchase price of the Interest, the Defaulting Co-Owner and its owner will remain liable for such deficiency. Closing shall occur within 30 days after the date the Buy-Out Notice is given at such time and place specified by the Non-Defaulting Co-Owner who issued the Buy-Out Notice. Should the Defaulting Co-Owner fail to accept tender of the purchase price from the Non-Defaulting Co-Owners, the purchase shall nonetheless be deemed to have closed upon deposit of the funds by the purchasing Non-Defaulting Co-Owners with Chicago Title & Trust Company or other institutional escrowee under instructions that the same shall be payable to the Defaulting Co-Owner upon demand. Each Co-Owner hereby grants a special and limited power of attorney to the Manager to deliver, at closing, the deed to its Interest to any purchasing Co-Owner in order to effectuate the sale of such Interest pursuant to this Section 4.5. Notwithstanding the foregoing, or any other provision of this Agreement to the contrary, the transfer of any Interest pursuant to this clause (ii) must be consummated in compliance with the transfer requirements set forth in the Loan Documents.

(iii)   If there is any conflict between the purchase option in clause (ii) and any pending action pursuant to clause (i), above, the latter (clause (i)) shall be stayed and the former (clause (ii)) shall have priority.

4.6     Right of Contribution. Each Co-Owner hereby agrees that:

(a)     if there is a default on the Loan and the Lender forecloses on or otherwise takes title to part or all of the Interest of a Co-Owner; and

(b)     neither such Co-Owner nor its owner caused such default (each Co-Owner that satisfies Sections 4.6(a) and 4.6(b) is a "**Foreclosed Co-Owner**");

then: (i) each Co-Owner whose actions (or whose owner's actions) caused the default (each such Co-Owner a "**Violating Co-Owner**") shall transfer part or all of its Interest to the Foreclosed Co-Owner(s) such that the amount of the Interest held by the Foreclosed Co-Owner(s) is fully restored to the amount held immediately prior to the default; and (ii) to the extent the Foreclosed Co-Owner(s) are not fully restored pursuant to clause (i) above, each Co-Owner that is not a Foreclosed Co-Owner or Violating Co-Owner (each a "**Remaining Co-Owner**") shall transfer a portion of its Interest to the Foreclosed Co-Owner(s) such that the Foreclosed Co-Owner(s) and the Remaining Co-Owners each equitably bear the consequences of the default in proportion to their respective Ownership Interests immediately prior to the default. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be bound by the terms, conditions and obligations of this Section 4.6.

5

## ARTICLE 5
## [INTENTIONALLY OMITTED]

## ARTICLE 6
## RIGHTS AND OBLIGATIONS OF CO-OWNERS

6.1     Rights of Co-Owners.  Each Co-Owner shall have the right to transfer, partition, and encumber the Co-Owner's Interest in the Property, provided that:

(a)     No transfer shall be permitted if the number of Co-Owners after such transfer would exceed the number of persons specified in Section 1.4 hereof, or such lesser number required by the Loan Documents.

(b)     Any transfer (whether voluntary or involuntary), partition or encumbrance of a Co-Owner's Interest in the Property must satisfy all of the terms and provisions of the Loan Documents and may not constitute an event of default thereunder.  Notwithstanding anything to the contrary herein, as a condition of making the Loan, Lender has required that the Co-Owners waive their right to file a complaint or institute any proceeding at law or in equity to have the Property partitioned in accordance with local law, and each Co-Owner hereby waives such rights to the greatest extent permitted by applicable law.  Such waiver shall only be effective for so long as any obligations of the Co-Owners under the Loan or the Loan Documents remain outstanding.

(c)     The transferor and transferee shall execute a written assignment and assumption agreement whereby the transferor assigns to the transferee all of its right, title and interest in and to this Agreement and the Management Agreement, and the transferee assumes and agrees to be bound by all terms, conditions, restrictions, and limitations set forth in this Agreement and the Management Agreement.

(d)     The transferor shall reimburse the other Co-Owners (or their owners, as applicable) for all reasonable fees and expenses and other costs that they incur as a result of the transaction.

(e)     The transferee is an "accredited investor" as defined in Rule 501 of Regulation D of the General Rules and Regulations promulgated under the Securities Act of 1933.

The limitations contained in paragraphs (a) through (d), above, shall apply notwithstanding any other provision contained in this Article specifically or this Agreement generally.

6.2     Decisions of Co-Owners.

(a)     The following actions require the unanimous consent of all Co-Owners:  (i) entering into any agreement for the sale, transfer, or exchange of all or any portion of the Property; (ii) except for Small Leases (as defined below), entering into, modifying, extending, renewing or canceling any other lease with respect to the Property or any portion thereof to which the Co-Owners are a party; (iii) modifying the leasing parameters applicable to leases that individually comprise 7.5 percent or less of the Property, but only if all such leases comprise less than 50 percent of the Property (the "Small Leases"); (iv) entering into, modifying, extending, renewing or canceling any agreement pertaining to any indebtedness to be secured in whole or in part by any mortgage, trust deed, pledge, lien or other encumbrance upon the Property; or (v) hiring or replacing the Manager or any manager or broker or entering into, extending or renewing any management or brokerage agreement for the Property or agreement with the Manager or any manager.  For the avoidance of doubt, the hiring and replacing of the Manager shall occur pursuant to the terms of the Management Agreement, and without the prior written consent of the Lender, neither the Manager or the Management Agreement may be terminated and no election by the Co-Owners not to renew the Management Agreement shall be be effective.

(b)     Whenever an action by the Co-Owners is proposed by any Co-Owner, the Manager shall first send to all Co-Owners written notice (the "Decision Notice") setting forth the particulars of the decision (the "Decision").  The Decision Notice shall include a ballot on which the Co-Owner may mark its vote for or against the Decision.  Consistent with the provisions of Section 10.1, the Co-Owners shall respond to the Decision Notice by

returning the marked ballot to the Manager within 15 days of the receipt of the Decision Notice. A Co-Owner not returning the ballot within the prescribed period shall be deemed to have voted for the Decision. The Manager shall notify all Co-Owners of the results of the vote (the "Outcome Notice"). If the Decision does not require the unanimous approval of the Co-Owners, the Manager shall be authorized to take action with respect to such Decision if such Decision has been approved by Co-Owners holding a majority of the Ownership Interests. If the Decision requires unanimous approval of the Co-Owners, the Manager shall be authorized to take action with respect to such Decision if the Co-Owners have unanimously approved it; but if such Decision has not been unanimously approved, the procedure in Section 6.8 hereof shall apply.

6.3     Transfers Not Subject to Right of First Offer or Right of Second Offer.  Subject to the provisions of Section 6.1 above, a Co-Owner may sell, assign, or transfer all or any part of its Interest, and an owner of a Co-Owner may sell, assign or transfer all or any part of its ownership interest in a Co-Owner, to: (a) the owner's parents, spouse, descendants and/or spouse of his or her descendants, stepson or stepdaughter or a descendant of either, (b) a trust established for the benefit of the owner or any one or more of the individuals described in clause (a), above, (c) any person that is already an owner of a Co-Owner, or (d) any Co-Owner or any entity wholly-owned and controlled by one or more of the owners and/or any individuals or trusts described in clauses (a) through (c) above. None of the foregoing transfers shall be subject to the provisions of Section 6.4 below.

6.4     Transfers Subject to Right of First Offer and Right of Second Offer.

(a)     If a Co-Owner, or an owner of a Co-Owner that is an SPE (each a "Seller"), desires to sell, assign, or transfer all or any part of its Interest, or interest in a Co-Owner that is an SPE, as the case may be (the "Offered Interest") to a person not described in Section 6.3 above, the Seller shall give written notice (the "Offer Notice") to the other Co-Owners (the "Non-Selling Co-Owners") and to the Manager of its desire to complete such sale.

(b)     For a period of 10 days after the receipt of the Offer Notice (the "First Offer Period"), any Non-Selling Co-Owner may advise the Seller in writing, with a copy to all Non-Selling Co-Owners and the Manager, of the price at which such Non-Selling Co-Owner would be willing to purchase all, but not less than all, of the Offered Interest. If more than one Non-Selling Co-Owner wishes to purchase such Offered Interest at the same price, then such Non-Selling Co-Owners shall divide the right to purchase the Offered Interest in proportion to their respective Ownership Interests or as they might otherwise agree.

(c)     Within five days after the end of the First Offer Period (the "First Decision Period"), the Seller shall accept or reject by written notice to the Non-Selling Co-Owners and the Manager the highest offer for the Offered Interest received by the Seller from any of the Non-Selling Co-Owners. If the Seller fails to give written notice to the Non-Selling Co-Owners within the First Decision Period, any offer made shall be deemed to be rejected.

(d)     If the Seller shall have rejected the offer of the Non-Selling Co-Owners, or if no offer shall have been made by a Non-Selling Co-Owner, then, for a period of 10 days after the end of the First Decision Period (the "Second Offer Period"), the Manager may advise the Seller in writing, with a copy to all Non-Selling Co-Owners, of the price at which it or its designee would be willing to purchase all, but not less than all, of the Offered Interest. If the Non-Selling Co-Owners have made an offer for the Offered Interest that has been rejected by the Seller, the Manager shall not make an offer for the Offered Interest unless its offer is higher than the highest offer made by a Non-Selling Co-Owner.

(e)     Within five days after the end of the Second Offer Period, the Seller shall accept or reject the offer of the Manager by written notice to the Manager and the Non-Selling Co-Owners. If the Seller fails to give written notice to the Manager within the Second Decision Period, its offer shall be deemed to be rejected.

(f)     If the Selling Owner accepts the highest offer, whether made by a Non-Selling Co-Owner or the Manager, then the Seller and the purchaser (or purchasers) shall close the sale of the Offered Interest pursuant to subparagraph (g) below. If the Seller rejects or is deemed to have rejected the highest offer, then the Seller shall be entitled to sell the Offered Interest to a third party if each of the following three conditions is met: (i) the sale is an all-cash transaction; (ii) the sale is completed within 90 days after the end of the Second Offer Period; and (iii)

7

the price to be paid by the third party is at least 105% of the highest offer made by a Non-Selling Co-Owner or the Manager.

(g)     If neither the Non-Selling Co-Owners nor the Manager respond to the Seller's Offer Notice within the First Offer Period or the Second Offer Period (as the case may be), then the Seller shall be entitled to sell the Offered Interest to a third party in an all-cash transaction for a purchase price acceptable to the Seller, which transaction shall be completed, if at all, within 90 days after the end of the Second Offer Period.

(h)     The closing of a sale and purchase of the Offered Interest pursuant to Section 6.4(f) shall take place at a time, place and date mutually agreeable to the selling and purchasing parties, but not more than 90 days after the end of the Second Offer Period.

(i)     If any proposed transfer of the Offered Interest pursuant to Section 6.4(f) is not consummated within the time period set forth herein through no fault of the purchaser (or purchasers), the terms and conditions of this Section shall again apply. If the proposed transfer of the Offered Interest pursuant to Section 6.4(f) is not consummated within the time period set forth herein as a result of the fault of the purchaser (or purchasers), the Seller shall be entitled to sell the Offered Interest to a third party in an all-cash transaction for a purchase price acceptable to the Seller, which transaction shall be completed at any time within 150 days after the end of the Second Offer Period.

(j)     Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be bound by the terms, conditions and obligations of this Section 6.4.

6.5     Right of First Refusal and Right of Second Refusal Prior to Partition.

(a)     Prior to any Co-Owner exercising its right of partition hereunder, the Co-Owner (the "Partitioning Co-Owner") shall offer its Interest (the "Partition Interest") for sale to the other Co-Owners and the Manager by giving written notice (the "Partition Notice") to the other Co-Owners (the "Non-partitioning Co-Owners") and to the Manager of its desire to exercise its right of partition.

(b)     For a period of 30 days after the receipt of the Partition Notice (the "First Partition Offer Period"), any Non-partitioning Co-Owner (each a "Purchasing Co-Owner"), at its option, may advise the Partitioning Co-Owner in writing, with a copy to all Non-partitioning Co-Owners and the Manager of the desire to purchase any or all of the Partition Interest for a purchase price reflecting the fair market value of the Partition Interest as determined pursuant to Section 6.6 below as of the date of the giving of the Partition Notice. If there is more than one Purchasing Co-Owner and all responding Co-Owners' purchase offers exceed the amount of the Partitioning Co-Owner's Interest, then the Partition Interest shall be allocated among the Purchasing Co-Owners in proportion to their respective Ownership Interests or as they might otherwise agree.

(c)     If the Non-partitioning Co-Owners do not respond to the Partitioning Co-Owner's Offer Notice within the First Partition Offer Period, or if the Non-partitioning Co-Owners do not in the aggregate offer to purchase all of the Partition Interest, then for a period of 15 days after the expiration of the First Partition Offer Period (the "Second Partition Offer Period") the Manager may advise the Partitioning Co-Owner in writing, with a copy to all Non-partitioning Co-Owners, of the desire to purchase any or all of the remaining Partition Interest for its own account or the account of its designee for a purchase price in an amount equal to the fair market value of the Partition Interest as determined pursuant to Section 6.6 below as of the date of the giving of the Partition Notice.

(d)     If the Manager does not elect to purchase or have its designee purchase the remaining Partition Interest by the end of the Second Partition Offer Period, the Partitioning Co-Owner shall be entitled to seek partition of the Property, which partition action must be commenced within 30 days after the end of the Second Partition Offer Period. If no partition action is brought within such time period, the terms and conditions of this Section shall again apply. Once the partition action is commenced, the Partitioning Co-Owner must thereafter diligently and in good faith proceed to completion of the partition action. Each Co-Owner has the affirmative right to intervene in such action as it shall determine to be necessary and appropriate with respect to its Interest.

8

(e)     The closing of a sale and purchase of the Partition Interest pursuant to this Section 6.5 shall take place at a time, place and date mutually agreeable to the selling and purchasing parties, but not more than 90 days after the end of the Second Partition Offer Period.

(f)     If any proposed transfer of the Partition Interest is not consummated within the time period set forth herein through no fault of the Purchasing Co-Owner, the terms and conditions of this Section shall again apply.  If the proposed transfer of the Partition Interest is not consummated within the time period set forth herein as a result of the fault of the Purchasing Co-Owner, the Partitioning Co-Owner shall be entitled to seek partition of the Property as set forth herein.

6.6     Fair Market Value.  Whenever required hereunder, the fair market value of an Interest shall be determined by agreement of the seller and the purchaser.  The seller and purchaser shall attempt to reach agreement until: (a) the end of the 15th day after the end of the First Partition Offer Period (or Second Partition Offer Period, if applicable) pursuant to Section 6.5 (with respect to a fair market value determination required under Section 6.5 of this Agreement); (b) the end of the 15th day after the end of the notice period described in Section 6.7(b) (with respect to a fair market value determination required pursuant to Section 6.7 of this Agreement); or (c) the end of the 15th day after the giving of the Buy-Out Notice (with respect to a fair market value determination required pursuant to Section 4.5).  If no agreement is reached, the seller, on the one hand, and the purchasers and/or the Manager, on the other hand, shall each select one independent appraiser (the "**Initial Appraisers**") within seven days after the expiration of the aforementioned time periods, which Initial Appraisers shall make a determination of the fair market value of the Interest within 30 days of the appointment of the last appraiser.  If a party fails to select an independent appraiser within such seven day period, the appraisal from the other party shall be the fair market value of the Interest.  To determine the fair market value of an Interest, the appraisers shall determine the fair market value of the Property, minus all debts and expenses of the Property, and multiply such amount by the seller's Ownership Interest (or ratable portion thereof if the Co-Owner's entire Interest is not being sold), provided, however, that to the extent the fair market value determination is being made in respect of an Interest of less than 50 percent, all appraisals made pursuant to this Section 6.6 shall take into account a reasonable minority and lack of marketability discount, which discount the parties hereto agree shall be 25 percent.  If the fair market values calculated by the Initial Appraisers differ by less than ten percent of the highest appraisal, the fair market values of the Initial Appraisers shall be averaged and the resulting amount shall be the fair market value of the Property.  If any of the fair market values determined by the Initial Appraisers differ by ten percent or more of the highest appraisal, then the Initial Appraisers shall jointly select one appraiser (the "**Final Appraiser**") within 10 days after the delivery of the last appraisal.  The Final Appraiser shall choose the appraisal of the Initial Appraiser which the Final Appraiser determines to be closest in value to the fair market value of the Property within 15 days after its appointment.  Costs of the Initial Appraisers shall be borne by the person(s) who appointed them.  Costs of the Final Appraiser shall be divided equally among the persons who appointed the Initial Appraisers.

6.7     Bankruptcy and Default.

(a)     The Co-Owners agree that, as a condition precedent to entering into this Agreement, a Co-Owner experiencing an Event of Bankruptcy (as defined in Section 6.7(f)) or an Event of Default (as defined in Section 6.7(g)) (a "**Breaching Co-Owner**") shall give written notice to the other Co-Owners and the Manager of the such event (a "**Breach Notice**") and offer its Interest in the Property (the "**Breaching Co-Owner Interest**") to the other Co-Owners and to the Manager.

(b)     For a period of 30 days after the latter of (i) receipt of a Breach Notice or (ii) the Co-Owners discovering an Event of Bankruptcy or an Event of Default (the "**First Breach Offer Period**"), any of the remaining Co-Owners (the "**Purchasing Co-Owners**") may advise the Breaching Co-Owner in writing, with a copy to all remaining Co-Owners and the Manager of the desire to purchase any or all of the Breaching Co-Owner Interest for a purchase price in an amount equal to the fair market value of the Breaching Co-Owner Interest as determined pursuant to Section 6.6 above as of the date of the giving of the Breach Notice.  If there is more than one Purchasing Co-Owner purchasing the Breaching Co-Owner Interest and all responding Co-Owners purchase offers exceed the amount of the Breaching Co-Owner's Interest, then the Breaching Co-Owner Interest shall be allocated among the Purchasing Co-Owners in proportion to their respective Ownership Interests or as they might otherwise agree.

(c)     If the remaining Co-Owners do not respond to the Breach Notice within the First Breach Offer Period, or if the non-Breaching Co-Owners do not in the aggregate offer to purchase all of the Breaching Co-Owner Interest, then for a period of 15 days after the expiration of the First Breach Offer Period (the "**Second Breach Offer Period**") the Manager may advise the Breaching Co-Owner in writing, with a copy to all other Co-Owners, of the desire to purchase any or all of the remaining Breaching Co-Owner Interest for its own account or the account of its designee for a purchase price in an amount equal to the fair market value of the remaining Breaching Co-Owner Interest as determined pursuant to Section 6.6 above as of the date of the giving of the Breach Notice.

(d)     The closing of a sale and purchase of the Breaching Co-Owner Interest pursuant to this Section shall take place at a time, place and date mutually agreeable to the selling and purchasing parties, but not more than 30 days after the end of the Second Breach Offer Period.

(e)     Notwithstanding the foregoing, any transferee of an Interest must satisfy the terms and conditions set forth in Section 6.1 of this Agreement.

(f)     The Co-Owners agree that any of the following events shall constitute an "**Event of Bankruptcy**" with respect to any Co-Owner (and with respect to any of its successors in interest): (i) if a receiver, liquidator or trustee is appointed for any Co-Owner; (ii) if a Co-Owner's becomes insolvent, makes an assignment for the benefit of creditors, or admits in writing of its inability to pay its debts generally as they become due; or (iii) if any petition for bankruptcy, reorganization, liquidation or arrangement pursuant to federal bankruptcy law, or similar federal or state law, is filed against, consented to or acquiesced in by a Co-Owner, *provided, however,* that if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Co-Owner then, if the same is not discharged, stayed or dismissed within thirty (30) days thereof.

(g)     The Co-Owners agree that a "**Event of Default**" with respect to any Co-Owner (and with respect to any of its successors in interest) shall mean causing, or failing to take action to prevent or cure, an event of default, including, for avoidance of doubt, any attempted or purported transfer of an Interest or an interest in a Co-Owner not in accordance with this Agreement (whether such event of default is voluntary or involuntary), and the expiration of any notice and cure periods provided therefor, under the Loan Documents, the Management Agreement or this Agreement with respect to the Property.

(h)     Any Purchasing Co-Owner that acquires all or any part of the Interest of any Breaching Co-Owner pursuant to the terms and conditions of this Section 6.7 shall take all necessary and appropriate steps to remedy, as soon as practicable, any breach (other than an Event of Bankruptcy) attributable to the Interest purchased that triggered the Breach Notice.

(i)     The rights of any Purchasing Co-Owner pursuant to this Section 6.7 shall be subordinate to the rights of any Lending Co-Owner pursuant to Section 4.5 and of any Foreclosed Co-Owner pursuant to Section 4.6.

### 6.8     Approving Owner Option.

(a)     In the event that the Co-Owners are unable to obtain unanimous approval of any decision requiring unanimity (each, a "**Material Decision**"), but Co-Owners owning at least 75% of the Ownership Interests vote (or are deemed to have voted) in favor of such action (the "**Approving Owners**"), one or more of the Approving Co-Owners (the "**Acquiring Owners**") may offer (the "**Offer**") to purchase the Interests held by the non-Approving Co-Owners (the "**Dissenting Owners**") within 30 days of the Outcome Notice for a purchase price indicated in the Offer (the "**Offer Amount**"), which Offer Amount shall be the aggregate dollar amount the Acquiring Co-Owners would be willing to pay for the Interests of the Dissenting Owners.  On or before fifteen (15) days after the date of the Offer, the Dissenting Owners shall either (i) consent to the Decision; (ii) sell their Interests to the Acquiring Owners for the Offer Amount; or (iii) if the Dissenting Owners do not elect either alternative (i) or (ii), they must purchase the Interests of the Acquiring Owners and make a binding offer to purchase the Interests of the other Approving Co-Owners under substantially the same terms and conditions as offered by the Acquiring Owners, provided that the Offer Amount shall be adjusted to reflect the aggregate percentage ownership of the Approving Owners.  If some, but not all, of the Dissenting Owners elect at such time to consent to the Decision,

those consenting members shall then become Approving Owners for purposes of (ii) and (iii) above. The obligation of the Acquiring Owners or Dissenting Owners to acquire the Interests of the other owners and the allocations of the Interests amongst the purchasing group, shall be apportioned between the members of the purchasing group as they unanimously agree. If they do not unanimously agree, the obligation to acquire the Interests and the allocation thereof shall be apportioned based upon each member's pro rata share calculated as their then-current Interest divided by all the then-current Interests of the purchasing group. In the event a Dissenting Owner fails to respond or act as required by this Section 6.8(a), each Dissenting Owner shall be deemed to have voted for the original action.

(b)     The closing of a sale and purchase of Interests pursuant to Section 6.8(a) shall take place at a time, place and date mutually agreeable to the selling and purchasing parties, but not more than 60 days after the date of the Offer.

6.9     Assignment. Any rights of the Manager to acquire an Interest (or any ownership interest in a Co-Owner, as applicable) under this Article 6 may be exercised by any affiliate or designee of the Manager.

### ARTICLE 7
### INDEMNIFICATION

7.1     General. Each Co-Owner, as indemnitor, shall indemnify, defend and hold harmless each of the other Co-Owners and the Manager from and against all losses, damages, penalties and liabilities of every kind, arising in any manner out of the indemnitor's failure to perform or observe any of the terms or provisions of this Agreement.

7.2     Indemnification for Loan Default Damages. In addition to the indemnification provided by Section 7.1, each owner of a Co-Owner, as indemnitor, shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against losses, damages, penalties and liabilities of every kind, arising in any manner out of a default on the Loan caused by the indemnitor or the Co-Owner owned by such indemnitor. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be bound by the terms and conditions of this Section 7.2.

7.3     Survival of Indemnification. The provisions contained in this Article 7 shall survive the termination of this Agreement.

### ARTICLE 8
### TERM

8.1     Term.

(a)     The term of this Agreement commenced upon the date hereof and shall terminate upon the occurrence of any of the following events: (i) the Co-Owners unanimously agree in writing to terminate this Agreement; (ii) the Co-Owners jointly sell, exchange, or otherwise dispose of the entire Property and distribute the proceeds in liquidation; (iii) the Property is partitioned among the Co-Owners; or (iv) one Co-Owner acquires fee simple title to the entire Property. Notwithstanding the foregoing, or any other provision of this Agreement to the contrary, for so long as the Loan is outstanding, this Agreement may not be terminated without the prior written consent of the Lender.

(b)     Neither the death, retirement, removal, withdrawal, termination or resignation of the Manager, or any assignment for the benefit of creditors by or the adjudication of bankruptcy or incompetency of the Manager shall cause the termination of this Agreement.

8.2     Accounting on Termination. In the event of any termination of this Agreement, there shall be a prompt accounting by Manager with respect to the Property. A termination shall not relieve any Co-Owner, or its owner, if applicable, of any obligations owing to any other Co-Owner existing at the time of such termination.

## ARTICLE 9
### ELECTION TO PURCHASE OWNERSHIP INTERESTS

For purposes of this Agreement, if a Co-Owner exercises a right to purchase the Interest of another Co-Owner pursuant to this Agreement, such purchasing Co-Owner may, elect, subject to compliance with the Loan Documents, to purchase, at closing, either (a) the Interest of the selling Co-Owner or (b) the ownership interest in such selling Co-Owner where such selling Co-Owner is an SPE. Each owner of a Co-Owner that is an SPE hereby grants a special and limited power of attorney to the Manager to deliver, at closing, the applicable portion of his ownership interest in such Co-Owner to any purchasing Co-Owner. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be bound by the terms, conditions and obligations of this Article 9.

## ARTICLE 10
### MISCELLANEOUS PROVISIONS

10.1    Notice. All notices, requests, demands and other communications required to or permitted to be given under this Agreement, shall be in writing and shall be conclusively deemed to have been duly given (a) when hand delivered; or (b) three business days after the same have been deposited in a United States post office via certified mail/return receipt requested; or (c) the next business day after same have been deposited with a national overnight delivery service (e.g., Federal Express) – in each case addressed to the parties at the address set forth beneath their signatures hereto. A party may change or supplement the addresses given above, or designate additional addresses, for purposes of this Section by giving the other parties written notice of the new address in the manner set forth above.

10.2    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the Co-Owners, and their respective heirs, executors, administrators, successors, and assigns, and the owners of the Co-Owners with respect to Sections 2.2, 4.5, 4.6, 6.4, 7.2, Article 9 and Section 10.6.

10.3    Entire Agreement; Modification; Waiver. This Agreement and any agreement, document or instrument referred to herein constitute the entire agreement between the Co-Owners pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the Co-Owners. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all of the Co-Owners. Further, for so long as the Loan is outstanding, this Agreement may not be modified or amended in any material manner without the consent of the Lender. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar. No waiver or consent shall constitute a continuing waiver or consent or commit a Co-Owner to provide a waiver in the future except to the extent specifically set forth in writing. No waiver shall be binding unless executed in writing by the Co-Owners making the waiver.

10.4    Severability. If any term or provision of this Agreement is determined to be illegal, unenforceable or invalid, in whole or in part for any reason, such illegal, unenforceable or invalid provision or part thereof shall be stricken from this Agreement and such provision shall not affect the legality, enforceability or validity of the remainder of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this Section, then such stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

10.5    Further Assurances. Each Co-Owner agrees to execute, with acknowledgment and affidavit if required, any and all documents and take all actions that may be reasonably required in furtherance of the provisions of this Agreement.

10.6    Attorneys' Fees. If any party to this Agreement (including for this purpose any owner of an interest in a Co-Owner that is a party to this Agreement) shall take any action to enforce this Agreement or bring any action for any relief against any other party, declaratory or otherwise, arising out of this Agreement, the non-prevailing party shall pay to the prevailing party a reasonable sum for attorneys' fees incurred in bringing such suit and/or enforcing any judgment granted therein, all of which shall be deemed to have accrued upon the

12

commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such judgment. For purposes of this Section, attorneys' fees shall include, without limitation, fees incurred in the following: (a) post-judgment motions and collection actions; (b) contempt proceedings; (c) garnishment, levy, and debtor and third party examinations; (d) discovery; and (e) bankruptcy litigation. Each owner of a Co-Owner shall join in this Agreement to acknowledge and agree to be personally liable for payment of attorneys fees if it or its Co-Owner is a non-prevailing party as described in this Section 10.6.

10.7    Exchange Cooperation. Any Co-Owner (or owner of a Co-Owner) choosing to purchase all or part of any other Co-Owner's Interest pursuant to this Agreement shall cooperate, at no cost or expense to such purchasing Co-Owner, with any selling Co-Owner (or owner of such Co-Owner) choosing to structure the sale of its Interest as a tax-deferred exchange pursuant to Code Section 1031 and the regulations thereunder.

10.8    Third Party Beneficiary. With respect to all terms and provisions of this Agreement relating to the Loan and Loan Documents, the Lender is hereby deemed to be a third party beneficiary.

10.9    Governing Law; Venue. This Agreement, and the Co-Owners' (and their owners) respective rights and obligations hereunder, shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts to be performed entirely within such state, including all matters of construction, validity and performance. Each party to this Agreement agrees to only bring suit in a court located in Chicago, Illinois, and consents to personal jurisdiction therein.

10.10   Counterparts; Facsimiles. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original (including copies sent to a party by facsimile transmission) as against the party signing such counterpart, but which together shall constitute one and the same instrument. Signatures transmitted via facsimile shall be considered authentic and binding.

10.11   Notice to Manager and Lender. If a Co-Owner (or owner of a Co-Owner) initiates litigation arising from or related to this Agreement, such Co-Owner (or owner) shall promptly provide written notice to the Manager and the Lender, including a reasonably detailed description of the nature of the litigation.

IN WITNESS WHEREOF, the Co-Owners and Manager set their signatures.

**SIGNATURES BEGIN ON FOLLOWING PAGE**

13

**SIGNATURE OF MANAGER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

USA Sunset Media Management, LLC,
a Delaware limited liability company

By: CB Richard Ellis Investors/U.S. Advisor LLC,
    a Delaware limited liability company

By: _____
     H. Michael Schwartz, Board Director

# SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

---

**USA Sunset Media 2, LLC,**
**a Delaware limited liability company**

By: Krause Family Trust
Its: Sole Member

By: _Bradley W Krause_
Bradley Krause, Trustee

By: _Mary Krause_
Mary Krause, Trustee

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 2, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name:      _BRADLEY  W  KRAUSE, TTE_

Signature:      _Bradley W Krause TTE_

Investor Name:      _MARY S. KRAUSE TTE_

Signature:      _Mary S. Krause_

Address:      _13130 New Suffolk Ave._
_Cutchogue, N.Y. 11935_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 3, LLC,**
**a Delaware limited liability company**

By: The Runes Living Trust DTD 05/27/83
Its: Sole Member

By: _Say W Runes, Trustee_
Gary W. Runes, Trustee

By: _Patricia R Runes_
Patricia R. Runes, Trustee

---

**JOINDER**

The undersigned, being the owner of USA Sunset Media 3, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _GARY W RUNES, TTEE_

Signature: _Gary W Runes, TTEE_

Investor Name: _PATRICIA R RUNES, TTEE_

Signature: _Patricia R Runes - TTEE_

Address: _144 PORTO MARINO DR_
_TIBURON, CA 94920_

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

---

**USA Sunset Media 4, LLC,**
**a Delaware limited liability company**

By: 1998 Fealy Family Trust
Its: Sole Member

By: _Morris J. Fealy, Trustee_
Morris J. Fealy, Trustee

By: _Linda W. Fealy, Trustee_
Linda W. Fealy, Trustee

---

### JOINDER

The undersigned, being the owner of USA Sunset Media 4, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "**Co-Owner**"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _1998 FEALY Family Trust_

Signature: _Morris J. Fealy, Trustee_

Investor Name: _1998 FEALY Family Trust_

Signature: _Linda W. Fealy, Trustee_

Address: _19 Scarborough Drive_
_Lake Oswego OR 97034_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 5, LLC,**
**a Delaware limited liability company**

By: KNF Investments, a California general partnership
Its: Sole Member

By: _____  Geri Morton
Russ Morton, General Partner

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 5, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _KNF Investments_

Signature: _____

Address: _P.O. Box 557_
_MAMMOTH LAKES CA._
_93546_

# SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

### FOR

### SUNSET MEDIA TOWER

**USA Sunset Media 6, LLC,**
**a Delaware limited liability company**

By: Robert A. Steinke and Sharon Steinke
Its: Sole Member

By: _____
Robert A. Steinke

By: _____
Sharon Steinke

## JOINDER

The undersigned, being the owner of USA Sunset Media 6, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: Robert A Steinke

Signature: _____

Investor Name: Sharon Steinke

Signature: _____

Address: 8541 St Marlo Fairway Drive
Duluth, Ga  30097

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 7, LLC,**
**a Delaware limited liability company**

By: Walker Family Trust
Its: Sole Member

By: _Samuel E. Walker_ TTEE
    Samuel E. Walker, Trustee

By: _Shelley B. Walker_ TTEE
    Shelley B. Walker, Trustee

## JOINDER

The undersigned, being the owner of USA Sunset Media 7, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _SAMUEL E WALKER_

Signature: _Samuel E. Walker_

Investor Name: _SHELLEY B. WALKER_

Signature: _Shelley B. Walker_

Address: _PO Box 611_
         _MAMMOTH LKS, CA. 93546_

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 8, LLC,**
**a Delaware limited liability company**

By: Michael R. Thompson and Raquel K. Thompson,
JTWROS
Its: Sole Member

By: _Michael R. Thompson_
Michael R. Thompson

Its: _Raquel K. Thompson_
Raquel K. Thompson

## JOINDER

The undersigned, being the owner of USA Sunset Media 8, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _Michael L Thompson_

Signature: _Michael K Thompson_

Investor Name: _Raquel K Thompson_

Signature: _Raquel K. Thompson_

Address: _3755 Green Hills_
_Bakersfield, Ca. 93306_

## SIGNATURE OF CO-OWNER

### TO THE

### CO-OWNERSHIP AGREEMENT

### FOR

### SUNSET MEDIA TOWER

**USA Sunset Media 9, LLC,**
**a Delaware limited liability company**

By:  James K. and Joanne S. Cooper Trust UAD 1996
Its:  Sole Member

By: _James K. Cooper, Trustee_
    James Cooper, Trustee

By: _Joanne S. Cooper, Trustee_
    Joanne Cooper, Trustee

### JOINDER

The undersigned, being the owner of USA Sunset Media 9, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes  (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that:  (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _James K. & Joanne S. Cooper Trust UAD 1996_

Signature: _James K. Cooper, Trustee_

Investor Name: _James K. & Joann S. Cooper Trust UAD 1996_

Signature: _Joanne S. Cooper, Trustee_

Address: _3045 Kerner Blvd. Suite "O"_
      _San Rafael, CA 94901_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

**USA Sunset Media 10, LLC,**
**a Delaware limited liability company**

By:  Tuseth Living Trust UAD 06/30/04
Its:  Sole Member

By:  ~Robert D. Tuseth~
Robert D. Tuseth, Trustee

By:  ~Diana B. Tuseth, TTEE~
Diana B. Tuseth, Trustee

---

**JOINDER**

The undersigned, being the owner of USA Sunset Media 10, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that:  (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name:  ~Robert D Tuseth~

Signature:  ~Robert D. Tuseth~

Investor Name:  Diana B Tuseth

Signature:  ~Diana B Tuseth~

Address:  10 6 4 2 EL TORO AVE
FOUNTAIN VALLEY, CA 92708

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 11, LLC,**
**a Delaware limited liability company**

By: Great Valley Land Company, LLC
Its: Sole Member

By: _____
    Don Daniels, Managing Member

By: _____
    Greg Nunley, Managing Member

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 11, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _____

Signature: _____

Investor Name: GREG NUNLEY

Signature: _____

Address: 4122 S. DEMAREE
         VISALIA CA 93277

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 12, LLC,
a Delaware limited liability company**

By: Keith E. Adams and Kim Adams Family Trust
Its: Sole Member

By: _____
Keith E. Adams, Trustee

By: _____
Kim Adams, Trustee

## JOINDER

The undersigned, being the owner of USA Sunset Media 12, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _____

Signature: _____

Investor Name: _____

Signature: _____

Address: _____

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 13, LLC,**
**a Delaware limited liability company**


By: Mittman Associates, Inc.
Its: Sole Member

By: _Ellen Davis_

Ellen Davis, Secretary

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 13, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the **"Co-Owner"**), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name:

Signature: _Ellen Davis_

Address:

## SIGNATURE OF CO-OWNER

### TO THE

### CO-OWNERSHIP AGREEMENT

### FOR

### SUNSET MEDIA TOWER

**USA Sunset Media 14, LLC,
a Delaware limited liability company**

By: Matsuoka Family Trust Dated 02/16/1984
Its: Sole Member

By: *Emi Matsuoka, TTEE*

Emi Matsuoka, Trustee

## JOINDER

The undersigned, being the owner of USA Sunset Media 14, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: *Emi Matsuoka EMI . MATSUOKA*

Signature: *Emi Matsuoka*

Address: *240 S. Berkeley, Pasadena Ca. 91107*

# SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

### FOR

### SUNSET MEDIA TOWER

**USA Sunset Media 15, LLC,**
**a Delaware limited liability company**

By: Tanya Christensen
Its:  Sole Member

By: _____

   Tanya Christensen

## JOINDER

The undersigned, being the owner of USA Sunset Media 15, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _____

Signature: _____

Address: _____

# SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

---

**USA Sunset Media 16, LLC,**
**a Delaware limited liability company**

By: Survivor's Trust UTD 09-14-89
Its: Sole Member

By: _____  TTE
    Peter E. Pulis, Trustee

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 16, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "**Co-Owner**"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: PETER E. PULIS

Signature: _____

Address: 10 74 TAHOE DR
         BELMONT CA 94002

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 17, LLC,**
**a Delaware limited liability company**

By: Jon Thomas Green Trust
Its: Sole Member

By: _____
Jon Thomas Green, Trustee

---

## JOINDER

The undersigned, being the owner of USA Sunset Media 17, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name:

Signature:

Address: 1729 Palm Canyon Drive #19
Palm Springs, CA 92264

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 18, LLC,**
**a Delaware limited liability company**

By: Swedes Ford Commons, L.P.
Its: Sole Member

By: _____

       Charles W. Bushar, III, Managing Member

## JOINDER

The undersigned, being the owner of USA Sunset Media 18, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "**Co-Owner**"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _Swedesford Commons, L.P._
_Charles W. Bushar II , Managing Member_

Signature: _____

Address: _53 E. Front St., Ste A-102_
_Bridgeport, PA 19405_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

**USA Sunset Media 19, LLC,**
**a Delaware limited liability company**

By: Hunt Trust, 4 Nov 1998
Its: Sole Member

By: _Tyler R. Hunt_
Tyler R. Hunt, Trustee

By: _Patsy O. Hunt, trustee_
Patsy O. Hunt, Trustee

## JOINDER

The undersigned, being the owner of USA Sunset Media 19, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

| | |
|---|---|
| Investor Name: | _Hunt Trust 4 Nov 1998_ |
| Signature: | _Tyler R. Hunt, trustee_ |
| Investor Name: | _Hunt Trust 4 Nov 1998_ |
| Signature: | _Patsy O. Hunt, trustee_ |
| Address: | _3919 Rivell Dr._ |
| | _Lafayette CA 94549_ |

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

**USA Sunset Media 20, LLC,**
**a Delaware limited liability company**

By: Brian Brown and Victoria Brown
Its: Sole Member

By: _____
Brian Brown,

By: _____
Victoria Brown

**JOINDER**

The undersigned, being the owner of USA Sunset Media 20, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the **"Co-Owner"**), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name:     Brian Brown

Signature:         _____

Investor Name:     Victoria Brown

Signature:         _____

Address:           9339 Benzen Dr
                   Pleasanton, CA 94588

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 21, LLC,**
**a Delaware limited liability company**

By: The Restated Forsyth Trust, Restated 09-19-00
Its: Sole Member

By: _M. Gordon Forsyth_

M. Gordon Forsyth, Trustee

## JOINDER

The undersigned, being the owner of USA Sunset Media 21, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6

Investor Name:     THE RESTATED FORSYTH TRUST, RESTATED 9-19-00

Signature:          _M. Gordon Forsyth_

Address:            PO Box 2031
                    RANCHO SANTA FE, CA., 92067

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 22, LLC,
a Delaware limited liability company**

By: Wendy L. Pero
Its: Sole Member

By: _Wendy L. Pero_
    Wendy L. Pero

## JOINDER

The undersigned, being the owner of USA Sunset Media 22, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the **"Co-Owner"**), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _Wendy L. Pero_

Signature: _Wendy L. Pero_

Address: _3311 Wenlock Edge Dr_
              _Smyrna, Ga 30080_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

**USA Sunset Media 23, LLC,**
**a Delaware limited liability company**

By: Sharon Woody
Its: Sole Member

By: _Sharon Woody_
Sharon Woody

## JOINDER

The undersigned, being the owner of USA Sunset Media 23, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _SHARON WOODY_

Signature: _Sharon Woody_

Address: _13210 McKinzie Lane_
_Summerville, OR_
_97876_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 24, LLC,
a Delaware limited liability company**

By: Mammoth Mall Management, Inc.
Its: Sole Member

By: _Josef Moeller_  Owner
   Josef Moeller, Owner

---

### JOINDER

The undersigned, being the owner of USA Sunset Media 24, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _Mammoth Mall Mgmt. Inc._

Signature: _Josef Mueller_

Address: _P. O. Box 710-3_
_Mammoth Lake, Ca. 93546_

**SIGNATURE OF CO-OWNER**

**TO THE**

**CO-OWNERSHIP AGREEMENT**

**FOR**

**SUNSET MEDIA TOWER**

---

**USA Sunset Media 25, LLC,**
**a Delaware limited liability company**


By: David T. Russell
Its: Sole Member

By: _____
    David T. Russell

---

### JOINDER

    The undersigned, being the owner of USA Sunset Media 25, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "**Co-Owner**"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.


Investor Name:      David T. Russell

Signature: _____

Address:      6182 Mulholland Hwy
                     Los Angeles, CA 90068

## SIGNATURE OF CO-OWNER

## TO THE

## CO-OWNERSHIP AGREEMENT

## FOR

## SUNSET MEDIA TOWER

**USA Sunset Media 26, LLC,**
**a Delaware limited liability company**

By: Michael and Penny Melin
Its: Sole Member

By: _____
Michael Melin

By: _____
Penny Melin

## JOINDER

The undersigned, being the owner of USA Sunset Media 26, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of this Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms, conditions and obligations of Section 4.6 of this Agreement; (d) the undersigned is bound by the terms and conditions of Section 6.4; (e) pursuant to Section 7.2, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and the Manager and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (f) the undersigned is bound by the terms and conditions and obligations of Article 9; and (g) the undersigned personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6.

Investor Name: _____

Signature: _____

Investor Name: _____

Signature: _____

Address: HLR 29 Box 55A MEMMCTALis
         CA · 93546

ASSIGNEE:

**USA SUNSET MEDIA 27, LLC,** a Delaware
limited liability company

By: _____
        H. Michael Schwartz
        Vice President


By:  Michael E. and Lezli Thompson Emerson
Its:  Sole Member

By: _____
        Michael E. Emerson

By: _____
        Lezli Thompson Emerson


## JOINDER

The undersigned, being the owner of USA Sunset Media 27, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.


Investor Name:       Michael E Emerson

Signature:           _____

Investor Name:       Lezli Thompson-Emerson

Signature:           _____

Address:             4620 Crispi Lane
                     Quartz Hill CA 93536


4

ASSIGNEE:

**USA SUNSET MEDIA 28, LLC**, a Delaware
limited liability company

By: _____
        H. Michael Schwartz
        Vice President


By: Bakes Family Limited Partnership
Its: Sole Member

By: GCD Corporation
Its: General Partner
By: _____
        George Bakes, President


## JOINDER

      The undersigned, being the owner of USA Sunset Media 28, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.


Investor Name:    George Bakes

Signature:         _____

Address:          118 Sylvan wd Avp

                   Norwalk, ct- 06850

4

**ASSIGNEE:**

**USA SUNSET MEDIA 29, LLC**, a Delaware limited liability company

By: _____

      H. Michael Schwartz
      Vice President


By: Welsh Etter Investments Company
Its: Sole Member

By: _____

      James T. Welsh, General Partner

## JOINDER

The undersigned, being the owner of USA Sunset Media 29, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.

Investor Name: _James T. Welsh_

Signature: _James T. Welsh_

Address: _1 E. 4114 Broadway_
_Spokane, WA 99202_

4

**ASSIGNEE:**

**USA SUNSET MEDIA 30, LLC,** a Delaware
limited liability company

By: _____

        H. Michael Schwartz
        Vice President


By:  1995 Jeffrey E. Schwartz Family Limited
       Partnership
Its:  Sole Member

Jeffrey E. Schwartz, General Partner


## JOINDER

The undersigned, being the owner of USA Sunset Media 30, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.

Investor Name: _____

Signature: _____

Address: _____

4

ASSIGNEE:

**USA SUNSET MEDIA 31, LLC,** a Delaware limited liability company

By: _____

        H. Michael Schwartz
        Vice President

By: Cathy Ann Schwartz
Its: Sole Member

By: _____
    Cathy Ann Schwartz

## JOINDER

The undersigned, being the owner of USA Sunset Media 31, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.

Investor Name:      Cathy Ann Schwartz

Signature:     

Address:      2812 breenwich St #2
                      SanFrancisco, CA 94123

4

<u>ASSIGNEE:</u>

**USA SUNSET MEDIA 32, LLC,** a Delaware
limited liability company

By: _____

             H. Michael Schwartz
             Vice President

By: Matilda Thompson
Its: Sole Member

By: _____

     Matilda Thompson

## <u>JOINDER</u>

The undersigned, being the owner of USA Sunset Media 32, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.

Investor Name:      MATILDA THOMPSON

Signature:

Address:      P.O. Box 991, 26 Walnut Ave
                   Ross, CA 94957

4

ASSIGNEE:

**USA SUNSET MEDIA 33, LLC**, a Delaware
limited liability company

By: _____
         H. Michael Schwartz
         Vice President


By:  Don Thompson
Its:  ~~Sole~~ Member

By: _____
        Don Thompson


## JOINDER

The undersigned, being the owner of USA Sunset Media 33, LLC, a Delaware limited liability company, and an entity disregarded separate from its owner for federal tax purposes (the "Co-Owner"), hereby joins in this Agreement for purposes of acknowledging and agreeing that: (a) the undersigned will ensure that the Co-Owner will at all times satisfy Section 2.2 of the Co-Ownership Agreement; (b) any loans which are made to the Co-Owner pursuant to Section 4.5 of the Co-Ownership Agreement are made with recourse to the undersigned; (c) the undersigned is bound by the terms and conditions of Section 6.4 of the Co-Ownership Agreement; (d) pursuant to Section 7.2 of the Co-Ownership Agreement, the undersigned shall indemnify, defend and hold harmless each of the other Co-Owners, their owners, and U.S. Commercial and its affiliates from and against all losses, damages, penalties and liabilities of every kind and arising in any manner out of a default on the Loan caused by the undersigned or the Co-Owner owned by the undersigned; (e) the undersigned is bound by the terms and conditions of Article 9 of the Co-Ownership Agreement; (f) the undersigned is personally liable for payment of attorneys fees if it is a non-prevailing party pursuant to Section 10.6 of the Co-Ownership Agreement, and (g) that any loans made to the undersigned pursuant to Section 7.3 of the Management Agreement are made with recourse to the undersigned.

Investor Name:  DON THOMPSON

Signature:

Address:  218 N. OLD QUARRY Rd.
              LARKSPUR, CA  94939


4